_____

**LOAN AGREEMENT**

Dated as of October 27, 2017

Between

GC SHL, LLC,
as Borrower

and

NATIXIS REAL ESTATE CAPITAL LLC
as Lender

_____

# TABLE OF CONTENTS

Page

1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION .................................................. 1

      1.1    Terms and Definitions ............................................................................. 1
             1.1.1    Key Terms and Definitions ......................................................... 1
             1.1.2    Additional Terms and Definitions ............................................... 2
      1.2    Index of Other Definitions ...................................................................... 12
      1.3    Principles of Construction ....................................................................... 12

2.    GENERAL LOAN TERMS ....................................................................................... 12

      2.1    The Loan .................................................................................................. 12
      2.2    Interest; Monthly Payments .................................................................... 13
             2.2.1    Generally.................................................................................... 13
             2.2.2    Default Rate ............................................................................... 13
             2.2.3    Taxes .......................................................................................... 13
             2.2.4    Requirements of Law ................................................................. 13
      2.3    Loan Repayment ...................................................................................... 14
             2.3.1    Repayment ................................................................................. 14
             2.3.2    Mandatory Prepayments ............................................................ 15
             2.3.3    Optional Prepayments ............................................................... 15
             2.3.4    Permitted Prepayment ............................................................... 15
      2.4    Release of Property .................................................................................. 15
      2.5    Payments and Computations ................................................................... 15
             2.5.1    Making of Payments ................................................................. 15
             2.5.2    Computations ............................................................................. 16
             2.5.3    Late Payment Charge ................................................................ 16
      2.6    Future Permitted Mezzanine Debt ........................................................... 16

3.    CASH MANAGEMENT AND RESERVES ............................................................... 17

      3.1    Cash Management Arrangements ............................................................. 17
      3.2    Required Repairs ...................................................................................... 17
             3.2.1    Completion of Required Repairs ............................................... 17
             3.2.2    Required Repairs Reserves ....................................................... 18
      3.3    Taxes and Insurance ................................................................................ 18
      3.4    FF&E Reserves ........................................................................................ 19
      3.5    Intentionally Deleted ............................................................................... 20
      3.6    Operating Expense Subaccount ............................................................... 20
      3.7    Casualty/Condemnation Subaccount ....................................................... 20
      3.8    Security Deposits ..................................................................................... 20
      3.9    Grant of Security Interest; Application of Funds..................................... 21
      3.10   Property Cash Flow Allocation................................................................ 21
      3.11   Cash Collateral Reserve .......................................................................... 22
      3.12   Façade Remediation Reserve ................................................................... 22
      3.13   Seasonal Reserve ..................................................................................... 24

4.      REPRESENTATIONS AND WARRANTIES..................................................................24

        4.1     Organization; Special Purpose..................................................................24
        4.2     Proceedings; Enforceability......................................................................24
        4.3     No Conflicts..............................................................................................25
        4.4     Litigation..................................................................................................25
        4.5     Agreements...............................................................................................25
        4.6     Title..........................................................................................................25
        4.7     No Bankruptcy Filing...............................................................................26
        4.8     Full and Accurate Disclosure....................................................................26
        4.9     No Plan Assets..........................................................................................26
        4.10    Compliance...............................................................................................26
        4.11    Contracts...................................................................................................27
        4.12    Federal Reserve Regulations; Investment Company Act ..........................27
        4.13    Utilities and Public Access.......................................................................27
        4.14    Physical Condition....................................................................................27
        4.15    Leases.......................................................................................................28
        4.16    Fraudulent Transfer...................................................................................28
        4.17    Ownership of Borrower.............................................................................28
        4.18    Management Agreement............................................................................28
        4.19    Hazardous Substances...............................................................................29
        4.20    Principal Place of Business.......................................................................29
        4.21    Other Debt.................................................................................................29
        4.22    Embargoed Person.....................................................................................29
        4.23    Anti-Money Laundering............................................................................29
        4.24    Liquor License..........................................................................................30
        4.25    Property Improvement Plan.......................................................................30
        4.26    Personal Property......................................................................................30

5.      COVENANTS ......................................................................................................30

        5.1     Existence...................................................................................................30
        5.2     Taxes.........................................................................................................30
        5.3     Repairs; Maintenance and Compliance; Alterations.................................31
                5.3.1   Repairs; Maintenance and Compliance......................................31
                5.3.2   Alterations..................................................................................31
        5.4     Performance of Other Agreements ............................................................31
        5.5     Cooperate in Legal Proceedings ...............................................................31
        5.6     Further Assurances....................................................................................31
        5.7     Environmental Matters..............................................................................32
                5.7.1   Hazardous Substances.................................................................32
                5.7.2   Environmental Monitoring ..........................................................32
        5.8     Title to the Property; Liens .......................................................................33
        5.9     Leases.......................................................................................................34
                5.9.1   Generally.....................................................................................34
                5.9.2   Leases.........................................................................................34
        5.10    Estoppel Statement ...................................................................................34
        5.11    Management Agreement.............................................................................34
                5.11.1  Affirmative Covenants................................................................34
                5.11.2  Negative Covenants....................................................................34
                5.11.3  Rights of Lender .........................................................................35

|  |  | 5.11.4 | Default; Right to Cure | 35 |
|  |  | 5.11.5 | Management Agreement Replacement | 36 |
|  |  | 5.11.6 | Approvals | 36 |
|  | 5.12 | Special Purpose Entity | | 37 |
|  | 5.13 | Assumption in Non-Consolidation Opinion | | 37 |
|  | 5.14 | Change In Business or Operation of Property | | 37 |
|  | 5.15 | Certain Prohibited Actions | | 37 |
|  | 5.16 | Prohibited Transfers | | 37 |
|  | 5.17 | Expenses | | 39 |
|  | 5.18 | Indemnity | | 40 |
|  | 5.19 | Embargoed Person | | 41 |
|  | 5.20 | Anti-Money Laundering | | 42 |
|  | 5.21 | ERISA | | 42 |
|  | 5.22 | Hotel Operation | | 42 |
|  | 5.23 | Cooperation with Regard to Liquor Licenses | | 42 |
|  | 5.24 | Mezzanine Loan | | 43 |
|  | 5.25 | Collective Bargaining Agreement | | 43 |
|  | 5.26 | Façade Remediation | | 43 |
| 6. | NOTICES AND REPORTING | | | 43 |
|  | 6.1 | Notices | | 43 |
|  | 6.2 | Borrower Notices and Deliveries | | 43 |
|  | 6.3 | Financial Reporting | | 44 |
|  |  | 6.3.1 | Bookkeeping | 44 |
|  |  | 6.3.2 | Annual Reports | 44 |
|  |  | 6.3.3 | Monthly Reports | 45 |
|  |  | 6.3.4 | Other Reports | 45 |
|  |  | 6.3.5 | Annual Budget | 45 |
|  |  | 6.3.6 | Breach | 46 |
|  |  | 6.3.7 | Hotel Accounting | 46 |
|  |  | 6.3.8 | Form of Reports | 46 |
| 7. | INSURANCE; CASUALTY; AND CONDEMNATION | | | 46 |
|  | 7.1 | Insurance | | 46 |
|  |  | 7.1.1 | Coverage | 46 |
|  |  | 7.1.2 | Policies | 48 |
|  | 7.2 | Casualty | | 49 |
|  |  | 7.2.1 | Notice; Restoration | 49 |
|  |  | 7.2.2 | Settlement of Proceeds | 49 |
|  | 7.3 | Condemnation | | 50 |
|  |  | 7.3.1 | Notice; Restoration | 50 |
|  |  | 7.3.2 | Collection of Award | 50 |
|  | 7.4 | Application of Proceeds or Award | | 50 |
|  |  | 7.4.1 | Application to Restoration | 50 |
|  |  | 7.4.2 | Application to Debt | 51 |
|  |  | 7.4.3 | Procedure for Application to Restoration | 51 |
|  |  | 7.4.4 | Prepayment upon Partial Condemnation | 52 |

8.    DEFAULTS .................................................................................................................... 52

    8.1    Events of Default ................................................................................................... 52
    8.2    Remedies ................................................................................................................ 54
        8.2.1    Acceleration ............................................................................................ 54
        8.2.2    Remedies Cumulative ............................................................................ 54
        8.2.3    Severance ................................................................................................ 55
        8.2.4    Delay ....................................................................................................... 55
        8.2.5    Lender's Right to Perform .................................................................... 55

9.    SECONDARY MARKET PROVISIONS .................................................................... 55

    9.1    Transfer of Loan .................................................................................................... 55
    9.2    Use of Information ................................................................................................. 58
    9.3    Borrower Indemnity .............................................................................................. 58
    9.4    Restructuring of Loan ........................................................................................... 60

10.    MISCELLANEOUS ..................................................................................................... 61

    10.1    Exculpation ........................................................................................................... 61
    10.2    Brokers and Financial Advisors ......................................................................... 64
    10.3    Retention of Servicer ........................................................................................... 64
    10.4    Survival .................................................................................................................. 64
    10.5    Lender's Discretion .............................................................................................. 64
    10.6    Governing Law ..................................................................................................... 64
    10.7    Modification, Waiver in Writing ........................................................................ 65
    10.8    Trial by Jury .......................................................................................................... 65
    10.9    Headings/Exhibits ................................................................................................ 66
    10.10    Severability ......................................................................................................... 66
    10.11    Preferences .......................................................................................................... 66
    10.12    Waiver of Notice ................................................................................................ 66
    10.13    Remedies of Borrower ....................................................................................... 66
    10.14    Prior Agreements ............................................................................................... 67
    10.15    Offsets, Counterclaims and Defenses ............................................................. 67
    10.16    Publicity .............................................................................................................. 67
    10.17    No Usury .............................................................................................................. 67
    10.18    Conflict; Construction of Documents ............................................................. 68
    10.19    No Third Party Beneficiaries ........................................................................... 68
    10.20    Yield Maintenance Premium ........................................................................... 68
    10.21    Assignment ......................................................................................................... 68
    10.22    Counterparts ....................................................................................................... 68

Schedule 1 –    Index of Other Definitions
Schedule 2 –    Required Repairs
Schedule 3 –    Organization of Borrower
Schedule 4 –    Definition of Special Purpose Entity
Schedule 5 –    Credit Card Direction Letter
Schedule 6 –    UNCF Definition
Schedule 7 –    Litigation

Schedule 8  –   List of pre-approved Qualified Managers
Schedule 9  –   Façade Remediation Consultants
Schedule 10  –  Schedule of Deposits to Required Repairs Reserve
Schedule 11  –  Schedule of Deposits to Façade Remediation Reserve

<u>**LOAN AGREEMENT**</u>

This LOAN AGREEMENT (as the same may be modified, supplemented, amended or otherwise changed, this "***Agreement***"), is made as of October 27, 2017, by and between GC SHL, LLC, a Delaware limited liability company (together with its permitted successors and assigns, "***Borrower***"), and NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company (together with its successors and assigns, "***Lender***").

**1.    <u>DEFINITIONS; PRINCIPLES OF CONSTRUCTION</u>**

    **1.1    <u>Terms and Definitions.</u>**  The following terms have the meanings set forth below:

        **1.1.1    <u>Key Terms and Definitions.</u>**

***Borrower Representative***:  GC SHL Holding, LLC, a Delaware limited liability company.

***Deposit Bank***:  Wells Fargo Bank, N.A., or such other bank or depository selected by Lender in its discretion.

***Guarantor***:  Initially, none.

***Interest Rate***:  a rate of interest equal to 4.727% per annum.

***Key Principals***:  any of (i) those certain Key Principals identified in the Key Principal Side Letter, (ii) any replacement approved by Lender in its sole and absolute discretion or (iii) upon the death or incapacity of a Key Principal, any suggested replacement that is approved by Lender in its sole and absolute discretion within thirty (30) days of such death or incapacity.

***Key Principal Side Letter***:  that certain side letter between Borrower and Lender, dated as of the date hereof, which identifies the Key Principals.

***Manager***:  Standard High Line Management, LLC, a Delaware limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with <u>Section 5.11</u> hereof.

***Management Agreement***:  that certain Hotel Management Agreement, dated December 30, 2005, between AB Green Gansevoort, LLC, a Delaware limited liability company ("***Original Owner***") and HotelsAB, LLC, a Delaware limited liability company ("***Original Manager***"), as assigned and amended by that certain Assignment and Assumption of Management Agreement, dated as of August 22, 2008, by Original Owner to ABG Standard Operator LLC ("***Operator***"), that certain Side Letter, dated May 19, 2011, between Original Owner, Operator and Original Manager, that certain Assignment and Assumption of Hotel Management Agreement, dated August 20, 2013, by Original Manager to Manager, that certain Consent Agreement dated August 10, 2017, between Operator and Manager, that certain Side Letter dated August 10, 2017, between Borrower and Manager, that certain Amendment to Hotel Management Agreement, dated and effective as of the "***Effective Date***" (i.e., the date of closing of Borrower purchasing the Hotel) between Borrower and Manager, and any Replacement Management Agreement pursuant to which the Property is operated as a hotel.

**Manager Subordination Agreement**:  that certain Assignment and Subordination and Non-Disturbance Agreement among Borrower, Lender and Manager and any renewals, modifications and substitutions therefor.

**Monthly Debt Service Payment Amount**:  shall mean the amount of interest accrued on the outstanding principal balance at the Interest Rate during the applicable Interest Period.

**Principal**:  maximum original principal amount of $170,000,000.00.

**Property**:  the parcel of real property and Improvements thereon owned by Borrower and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Security Instrument.  The Property is located in New York, New York.

**Start–up Date**:  the earlier of: (a) the fourth anniversary of the date hereof; and (b) the date that is the two (2) years from the "start–up day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust holding the Note, or if more than one Note exists evidencing the Debt the REMIC Trust holding the final portion of the Note to be securitized.

**Stated Maturity Date**:  November 5, 2027.

### 1.1.2    Additional Terms and Definitions.

**Affiliate**:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

**Approved Capital Expenses**:  Capital Expenses incurred by Borrower, provided that such Capital Expenses shall either be (i) included in the approved Capital Budget for the current calendar month, (ii) required by any Government Authority, (iii) required or permitted to be incurred by Manager pursuant to the Management Agreement or (iv) if not included in the approved Capital Budget for the current calendar month, then otherwise approved by Lender (in its reasonable discretion) in accordance with the provisions of the Loan Documents.

**Approved Operating Expenses**:  operating expenses incurred by Manager in accordance with the Management Agreement or by Borrower which (i) are included in the approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property, (iii) are Emergency Expenditures, (iv) any permitted deviations to the Operating Budget provided under the Management Agreement or (v) have been approved by Lender (in its reasonable discretion).

**Borrower's Certificate**:  a certificate delivered to Lender by Borrower which is signed by Borrower.

**Business Day**:  any day other than a Saturday or a Sunday or  any day on which commercial banks in New York, New York are authorized or required to close.

**Capital Expenses**:  expenses that are capital in nature or required under GAAP to be capitalized.

**Cash Sweep Period**:  shall commence upon Lender giving notice to Borrower and Clearing Bank of the occurrence of any of the following: (i)  an Event of Default has occurred and is continuing or (ii) the failure by Borrower, after the end of a calendar quarter, to maintain a Debt Yield of at least 6.00%, and shall end if (1) the Loan and all other obligations under the Loan Documents have been repaid in full, (2) with respect to a Cash Sweep Period continuing due to clause (i) above, if such Event of Default is cured by Borrower or waived by Lender (such cure and waiver to be  in Lender's sole and absolute discretion); provided that Lender shall not have exercised any of its rights under Section 10.2 hereof to accelerate the Loan, move to appoint a receiver or commence a foreclosure action, or (3) with respect to a Cash Sweep Period continuing due to clause (ii) above, for three (3) consecutive months since the commencement of the existing Cash Sweep Period (A) no Event of Default has occurred or is continuing, (B) no event that would trigger another Cash Sweep Period has occurred and (C) the Debt Yield is at least equal to 6.50%.

**Clearing Account**:  the account established by Borrower for the benefit of Lender at the Clearing Bank.

**Clearing Account Agreement**:  that certain agreement by and among Lender, Borrower, and Clearing Bank setting forth Borrower's and Clearing Bank's obligations relating to the establishment of the Clearing Account.

**Clearing Bank**:  the bank selected by Borrower and approved by Lender in its sole discretion at which the Clearing Account is established.

**Code**:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

**Control**:  with respect to any Person, either (i) ownership, directly or indirectly, of forty–nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

**Debt**:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

**Debt Service**:  with respect to any particular period, the aggregate of (i) scheduled interest payments due under the Note in such period and (ii) the Future Permitted Mezzanine Debt Service in such period, if any.

**Debt Service Coverage Ratio**:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

**Debt Yield:**  shall mean the ratio, expressed as a percentage, of (i) UNCF, to (ii) the then outstanding aggregate Principal balances of the Loan and, if any, the Future Permitted Mezzanine Debt.

**Default**:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

**Deposit Account**:  the Eligible Account at the Deposit Bank established and controlled by Lender to receive amounts from the Clearing Bank.

**Deposit Account Agreement**:  that certain agreement by and among Lender, Borrower and Deposit Bank establishing the Deposit Account and setting forth the parties' obligations relating to the funds transferred from the Clearing Account pursuant to the provisions of this Agreement.

**Eligible Account**:  shall mean either (i) an account maintained with the Deposit Bank or another depository institution or trust company; provided the short term unsecured debt obligations or commercial paper of such other depository institution or trust company are rated at least A-1 (or equivalent) by each Rating Agency in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days and the long term unsecured debt obligations of which are rated at least A (or equivalent) by each Rating Agency) or (ii) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and is subject to federal and state authority.

**Emergency Expenditures**:  Expenditures reasonably required to be made at the Property to protect life, safety or property of Borrower, Tenants, transient occupants, employees and other guests of the Property from imminent threats on or about the Property and as required for such purposes under the Management Agreement.

**ERISA**:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

**ERISA Affiliate**:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common Control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

**Escrows**:  amounts paid by Borrower into Subaccounts established for the purpose of paying Taxes and Insurance Premiums.

**FF&E**:  all machinery, furniture, furnishings, equipment, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory and articles of personal property, and all accessions, renewals, replacements and substitutions thereof (including, without limitation, beds, bureaus, chiffonniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and drink dispensers, ice makers, radios, clock radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, Wi-Fi systems, reservation systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage

disposals, washer and dryers), and all other customary hotel equipment and other tangible property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation and occupancy at the Property and all building equipment, material and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located at the Property, or appurtenant thereto, and useable in connection with the present or future operation, enjoyment and occupancy of the Property.

*Fiscal Year*: shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

*Force Majeure:* Industry wide strikes, industry-wide lockouts or labor disputes, acts of God, inability to obtain labor or material or reasonable substitutes therefor that could not reasonably have been anticipated, governmental restrictions, regulations or controls, delays in the issuance of permits beyond time periods typical for the area, enemy or hostile governmental action, civil commotion, fire or other casualty, any of which (a) could not reasonably have been anticipated by Borrower, (b) are beyond the reasonable control of Borrower and (c) by the exercise of due diligence, such party is unable, wholly or in part, to prevent or overcome.

*Future Permitted Mezzanine Debt*: mezzanine debt entered into in accordance with the provisions of Section 2.6 hereof.

*GAAP*: generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Governmental Authority*: any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Gross Revenues*: shall have the meaning set forth in the Management Agreement.

*Hotel Transactions*: shall mean, collectively, (i) occupancy arrangements for customary hotel transactions in the ordinary course of Borrower's business conducted at the hotel located at the Property, including nightly rentals (or licensing) of individual hotel rooms or suites, banquet room use and food and beverage services and (ii) informational or guest services which are terminable on one month's notice or less without cause and without penalty or premium, including co-marketing, promotional services and outsourced services.

*Interest Period*: (i) the period from the date hereof through the next day of a calendar month that is the fourth (4th) day of such calendar month, and (ii) each period thereafter from the fifth (5th) day of each calendar month through the fourth (4th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date. Notwithstanding the foregoing, in the event Lender shall have elected to change the date on which scheduled payments under the Loan are due, as described in the definition of "Payment Date", from and after the effective date of such election, each Interest Period shall commence on the day of each month in which occurs such changed Payment Date and end on the day immediately preceding the following Payment Date, as so changed.

*Inventory*: as defined in the UCC, and including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under USALI.

*Leases*:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.  As used herein, the term "*Leases*" shall not include Hotel Transactions.

*Legal Requirements*:  statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

*Lien*:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Borrower Representative, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Loan Documents*:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) Consolidated, Amended and Restated Promissory Note made by Borrower to Lender in the principal amount equal to the Loan (as the same may be amended, modified, restated, severed, split, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*"), (ii) the Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower in favor of Lender which covers the Property (the "*Security Instrument*"), (iii) the Assignment of Leases and Rents from Borrower to Lender, (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Clearing Account Agreement, and (vi) the Deposit Account Agreement; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

*Loan–to–Value*:  a fraction expressed as a percentage, the numerator of which is the principal balance of the Note and the principal balance of any Future Permitted Mezzanine Debt, and the denominator of which is the appraised value of the Property as determined by Lender based upon a current "as–is" MAI appraisal for the Property obtained by and acceptable to Lender at Borrower's sole cost and expense.

*Material Alteration*:  any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $1,500,000; provided, however, that in no event shall any of the following constitute a Material Alteration (a) any Required Repairs, (b) any repairs required by a Governmental Authority, (c) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (d) any repairs made pursuant to and in accordance with the Management Agreement (including without limitation to the extent set forth in any capital plan or budget prepared by Manager), (e) alterations performed as part of a Restoration, or (f) Façade Remediation.

**Maturity Date**:  the date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

**Mezzanine Lender**:  the lender of the Future Permitted Mezzanine Debt as set forth in Section 2.6 hereof.

**Mezzanine Loan Borrower**:  as defined in Section 2.6 hereof.

**Mezzanine Loan Documents**:  all documents executed with respect to the Future Permitted Mezzanine Debt.

**Mezzanine Loan Foreclosure**:  the foreclosure of, assignment in lieu of foreclosure of, or other realization on, the UCC security interests granted in connection with the Mezzanine Loan, which is completed in accordance with the Mezzanine Loan Documents and any intercreditor agreement then existing and related to the Mezzanine Loan.

**Mezzanine Loan Liens**:  the liens in favor of Mezzanine Lender created pursuant to the Mezzanine Loan Documents.

**Natixis**:  means Natixis Real Estate Capital LLC, a Delaware limited liability company, its successors and assigns.

**Net Operating Income**:  for any period, the actual net operating income of the Property after deducting therefrom deposits to (but not withdrawals from) any reserves required under this Agreement.

**NRSRO**:  shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

**Open Prepayment Date**:  the Payment Date which is closest to the one hundred eightieth (180) day prior to the Stated Maturity Date for the Loan.

**Payment Date**:  the fifth (5th) day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day; provided, however, that Lender may elect once during the Term, in its sole discretion, to change the date on which scheduled payments are due under the Loan to a later date only upon written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Payment Date shall be the date set forth therein.

**Permitted Encumbrances**:  (i) the Liens created by the Loan Documents, (ii) the Future Permitted Mezzanine Debt Liens, (iii) all Liens and other matters disclosed in the title insurance policy insuring the Lien of the Security Instrument, (iv) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent, (v) Liens that may exist in favor of Manager pursuant to the Management Agreement or under law, (vi) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien, (vii) rights of Tenant, as tenants only under prior unrecorded Leases and (viii) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

*Permitted Indebtedness*:  the Debt, obligations to Tenants under Leases, obligations to third parties under Hotel Transactions, obligations owed to Manager and its Affiliates under the Management Agreement, the obligations owed to Qualified Franchisor under any Replacement Franchise Agreement, and unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which trade payables do not exceed, at any time, a maximum amount of four percent (4%) of the original principal amount of the Loan and any Future Permitted Mezzanine Loan combined and are payable within thirty (30) days of the date incurred, but excluding from such trade payables any trade payables that are advanced booking deposits to the extent such refundable deposits are refundable.

*Permitted Transfers*:  (i) a Lease entered into in accordance with the Loan Documents, (ii) a Special Transfer in accordance with the requirements set forth in Section 5.16, (iii) a Permitted Encumbrance, (iv) a Mezzanine Loan Foreclosure, (v) provided that no Event of Default shall then be continuing, a Transfer of a direct or indirect interest in Borrower to any Person, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or Borrower Representative or (y) result in a Key Principal no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower or Borrower Representative through the ownership of voting securities, by contract or otherwise, (B) after giving effect to such Transfer, Key Principal shall continue to own at least 51% of all equity interests (direct or indirect) in Borrower, (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments proposed to effect such Transfer not less than ten (10) days prior to the date of such Transfer, and (D) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements, or (vi) a Transfer by devise or for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as a Key Principal continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, any Permitted Transfer must not be prohibited by the Management Agreement, and/or Borrower shall have obtained any consents required from Manager in connection with such Permitted Transfer, otherwise such Permitted Transfer shall not be allowed under this Agreement.

*Person*:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Plan*:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

*Qualified Manager*:  shall mean either (a) Manager; or (b) any of the managers listed on Schedule 8 hereto or (c) in the reasonable judgment of Lender, a reputable and experienced hotel manager or operator possessing experience in managing hotel properties similar in size, scope, use and value as the Property, provided, that with respect to any such manager or operator described in this clause (c), Borrower shall have obtained (i) Lender's prior written consent to such manager or operator (which consent shall not be unreasonably withheld, conditioned or delayed), and (ii) if deemed necessary by Lender, prior written confirmation from the applicable Rating Agencies that such new manager or

operator will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof.; provided, however, if such Qualified Manager does not also provide for a branded flag of hotel properties, Borrower must concurrently enter into a Replacement Franchise Agreement with a reputable and experienced franchisor possessing experience flagging hotel properties in similar size, scope use and value approved by Lender in its sole, but good faith discretion (a "***Qualified Franchisor***"); provided further, however, if Borrower intends to retain any of the managers listed on Schedule 8 attached hereto, then (x) Borrower shall not be required to enter into a Replacement Franchise Agreement with a Qualified Franchisor in connection with entering into a Replacement Management Agreement with any such manager listed on Schedule 8 attached hereto if the Debt Service Coverage Ratio as of the date on which Borrower enters into such Replacement Management Agreement is less than 1.50 to 1.00  or greater than 2.25 to 1.00 or (y) with Lender's prior written consent (which shall not be unreasonably withheld conditioned or delayed), Borrower shall not be required to enter into a Replacement Franchise Agreement with a Qualified Franchisor in connection with entering into a Replacement Management Agreement with any such manager listed on Schedule 8 attached hereto if the Debt Service Coverage Ratio as of the date on which Borrower enters into such Replacement Management Agreement is equal to or greater than 1.50 to 1.00 and less than 2.25 to 1.00.

     ***Quality Assurance Report***:  any quality assurance reports of inspection or compliance from Manager under the Management Agreement with respect to the Property, or any equivalent thereof.

     ***Rating Agency***:    each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("***S&P***"), Moody's Investors Service, Inc. ("***Moody's***"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

     ***Rating Comfort Letter***:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction, provided, however, in the event that, at any given time, no Rating Agencies have elected to consider whether to grant or withhold such an affirmation and Lender does not otherwise have an approval right with respect to such event, then the term Rating Comfort Letter shall be deemed instead to require the written, reasonable approval of Lender based on its good faith determination of whether the Rating Agencies would issue a Rating Comfort Letter, provided that the foregoing shall be inapplicable in any case in which Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

     ***Regulation AB***: shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

     ***Regulation S-K***:  shall mean Regulation S-K under the Securities Act, as such Regulation may be amended from time to time.

     ***Regulation S-X***:  shall mean Regulation S-X (17 C.F.R. Part 210) as it applies under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

     ***Related Loan***: shall mean a loan to an Affiliate of Borrower or secured by a Related Property, that is included in a Secondary Market Transaction with the Loan, and any other loan that is cross-collateralized with the Loan.

**Related Property**: shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

**REMIC Trust**: a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note, or any portion thereof.

**Rents**: all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, parking charges, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees, other operator or manager of the hotel or the commercial space located in the Improvements at the Property or any of their respective agents or employees or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales, and proceeds, if any, from business interruption or other loss of income insurance and proceeds, if any, from business interruption or other loss of income insurance.

**Replacement Franchise Agreement**:  shall mean a franchise, trademark and license agreement with a Qualified Franchisor, which franchise, trademark and license agreement shall be reasonably acceptable to Lender in form and substance; provided, with respect to this subclause, Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that licensing of the Property by such Person will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof.

**Replacement Management Agreement**:  shall mean (a) a management agreement substantially in the same form and substance as the Management Agreement or (b) a management agreement in form and substance acceptable to Lender in its reasonable discretion; provided, with respect to this subclause, Borrower shall have obtained prior written confirmation from the applicable Rating Agencies that management of the Property by such Person will not cause a downgrade, withdrawal or qualification of the then current ratings of the Securities or any class thereof.

**RevPAR**:  shall mean for any period of time, the revenue per available room as reasonably determined by Lender based upon the estimated or actual average daily room rate for such period of time, multiplied by the estimated or actual occupancy rate during the same period of time.

**Servicer**:  a servicer selected by Lender to service the Loan.

**Significant Obligor**: shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

**State**:  the state in which the Property is located.

**Taxes**:  all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

**Tenant**:  any existing tenant, replacement tenant or proposed tenant under any existing Lease or any proposed Lease.

**Term**:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Toxic Mold**:  any toxic mold or fungus at the Property which is of a type (i) that might pose a significant risk to human health or the environment or (ii) that would negatively impact the value of the Property.

**Transfer**:  any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture, of, on, in or affecting (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), (iii) any direct or indirect interest in Borrower Representative or (iv) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower or Borrower Representative, through the ownership of voting securities, by contract or otherwise.  Notwithstanding the foregoing, a Transfer shall not include any distribution of Net Operating Income to the members of Borrower or the payment of asset management fees by direct or indirect owners in Borrower, to the extent such distributions do not violate the terms of Loan Documents.

**UCC**:  the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

**UNCF**:  the net cash flow from the Property determined by Lender in accordance with the provisions contained in <u>Schedule 6</u>.

**USALI**:  shall mean the Uniform System of Accounts for the Lodging Industry, 11th edition (or most current edition).

**U.S. Obligations**:  Securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are (a) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (b) other "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended, which in each case are not subject to prepayment, call or early redemption.

**Welfare Plan**:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**Yield Maintenance Premium**:  means a prepayment fee equal to the greater of (i) one percent (1%) of the amount of Principal being prepaid (such percentage to be three percent (3%) if an Event of Default is continuing) and (ii) the product obtained by multiplying:

(A)     the amount of Principal being prepaid,

*by*

(B)     the excess (if any) of the Monthly Note Rate over the Assumed

Reinvestment Rate,

*by*

(C)        the Present Value Factor.

The following definitions shall apply:

**Monthly Note Rate:** one–twelfth (1/12) of the Interest Rate, expressed as a decimal calculated to five digits.

**Assumed Reinvestment Rate:** one–twelfth (1/12) of the yield rate equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Open Prepayment Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt (assuming prepayment in full on the Open Prepayment Date), with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield.

**Present Value Factor:** the factor that discounts to present value the costs resulting to Lender from the difference in interest rates during the months remaining between the date of prepayment and the Open Prepayment Date, using the Assumed Reinvestment Rate as the discount rate, with monthly compounding, expressed numerically as follows:

$$\frac{1 - \left(\dfrac{1}{1 + ARR}\right)^n}{ARR}$$

**n** = number of months remaining between the date of prepayment and the Open Prepayment Date

**ARR** = Assumed Reinvestment Rate

**1.2    Index of Other Definitions.**  An index of other terms which are defined in this Agreement or in other Loan Documents is set forth on **Schedule 1**.

**1.3    Principles of Construction.**  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

**2.    GENERAL LOAN TERMS**

**2.1    The Loan.**  Lender is making a loan (the "*Loan*") to Borrower on the date hereof, in the original principal amount (the "*Principal*") of $170,000,000.00, which shall mature on the Stated Maturity Date.  Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire or refinance the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction

costs.  Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.

>2.2    **Interest; Monthly Payments.**

>>2.2.1    **Generally.**  From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including November 4, 2017.  On December 5, 2017 (the "***First Payment Date***") and each Payment Date thereafter through and including the Payment Date immediately preceding the Stated Maturity Date, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount; which payment is based on the Interest Rate.  The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day.  All accrued and unpaid interest shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal through the end of the Interest Period during which such payment is made.

>>2.2.2    **Default Rate.**  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

>>2.2.3    **Taxes.**  Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by law or regulation of any Governmental Authority (all such non–excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.  Any Lender shall deliver to the Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 or other applicable form certifying or otherwise establishing that payment to such Lender is exempt from U.S. federal backup withholding tax.

>>2.2.4    **Requirements of Law.**

>>>(a)    If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)        shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii)        shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

(iii)        shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.  Borrower shall be required to pay Lender such additional amount only for so long as the change in Legal Requirement continues to exist.

(b)        If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall promptly, upon notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).  Borrower shall be required to pay Lender such additional amount only for so long as the change in Legal Requirement continues to exist.

(c)        If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled and a calculation of the additional amounts sought by Lender.  A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

## 2.3    Loan Repayment.

**2.3.1    Repayment.**  Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents.  Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs on or prior to the Open Prepayment Date).  If prior to the Open Prepayment Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive upon prepayment of the Debt, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium applicable to such prepayment.  During the continuance

of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed–in–lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

2.3.2    **Mandatory Prepayments.**  The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "***Casualty/Condemnation Prepayment***"), in the manner and to the extent set forth in Section 7.4.2.  Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1, and if such Casualty/Condemnation Payment is made on any date other than a Payment Date, then such Casualty/Condemnation Payment shall include interest that would have accrued on the Principal prepaid through the end of the Interest Period during which such payment is made.  Provided that no Event of Default is continuing (excluding any Event of Default directly caused by the Insured Casualty or Condemnation), any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.

2.3.3    **Optional Prepayments.**  Borrower shall have the right to prepay all or any portion of the Principal at any time provided that Borrower gives Lender at least fifteen (15) days prior written revocable notice thereof (which written notice may be revoked by Borrower at any time) and such prepayment is accompanied by the Yield Maintenance Premium applicable thereto.  If any such prepayment of Principal is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal through the end of the Interest Period during which such payment is made.

2.3.4    **Permitted Prepayment.**  On the Open Prepayment Date or on any Payment Date thereafter prior to the Stated Maturity Date, Borrower shall have the right to pay the entire Debt upon ten (10) Business Days revocable notice to Lender (which notice may be revoked by Borrower at any time), without payment of the Yield Maintenance Premium.  If any such payment of the Debt pursuant to the preceding sentence is made on any date other than the Open Prepayment Date or any Payment Date thereafter prior to the Stated Maturity Date, such payment shall be accompanied by a payment in an amount equal to interest on the unpaid Principal through the end of the Interest Period during which such payment is made.

2.4    **Release of Property.**  Except as set forth in this Section 2.4, no repayment or prepayment shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Liens of the Loan Documents if not theretofore released.

2.5    **Payments and Computations.**

2.5.1    **Making of Payments.**  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set–off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees

and court costs.

        **2.5.2**   **Computations.**  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360–day year.

        **2.5.3**   **Late Payment Charge.**  If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due other than payments of the Debt due upon the Maturity Date, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "***Late Payment Charge***"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

        **2.6**   **Future Permitted Mezzanine Debt.**  Notwithstanding any provisions of this Agreement, or any other Loan Document to the contrary, provided no Event of Default has occurred and is then continuing, following the occurrence of a securitization of the Loan as a Secondary Market Transaction, an Affiliate of Borrower (which, at Borrower's sole election, may be a newly formed Single Purpose Bankruptcy Remote Entity (i) that  is wholly owned by  GC SHL Holding, LLC, a Delaware limited liability company and (ii) to which one hundred (100%) percent of the ownership interests in Borrower are transferred in connection with the Future Permitted Mezzanine Debt, and upon obtaining any Future Permitted Mezzanine Debt, the Mezzanine Loan Borrower with respect hereto shall be the Borrower Representative for purposes of the Loan Documents) ("***Mezzanine Loan Borrower***") may obtain mezzanine financing from an institutional investor wholly acceptable to Lender; provided, however, before incurring any such mezzanine financing, the following pre-conditions must be wholly met to Lender's reasonable satisfaction:

        (a)    Lender shall reasonably approve all of the material terms of the mezzanine financing (the "***Mezzanine Loan***") and all Mezzanine Loan Documents; provided, however, the Mezzanine Borrower in its discretion shall be entitled to select between a defeasance or yield maintenance option for prepayment of the Mezzanine Loan;

        (b)    the maturity date of the Mezzanine Loan shall not be earlier than the Stated Maturity Date;

        (c)    Lender and Mezzanine Lender shall enter into a customary intercreditor agreement wholly acceptable to Lender;

        (d)    the aggregate of the Mezzanine Loan amount and the Debt shall not exceed seventy-five percent (75%) of the value of the Property, as determined by Lender pursuant to Lender's underwriting guidelines and upon review of a then-current MAI appraisal reasonably satisfactory to Lender prepared by an appraiser selected by Lender and paid for by Borrower that satisfies Lender's scope of work for such reports and is paid for in full by Borrower;

        (e)    the aggregate Debt Service Coverage Ratio for the Mezzanine Loan and the Debt as determined by Lender is not less than 1.50:1;

        (f)    if required by Lender, Lender shall have received evidence in writing from any applicable Rating Agency stating that the Mezzanine Loan will not result in downgrading, withdrawal or qualification of the respective rating in effect immediately prior to obtaining the Mezzanine Loan for any of the Securities; and

(g)    The Mezzanine Loan Borrower shall be permitted to prepay the Mezzanine Loan without any required contemporaneous prepayment of the Loan so long as the following conditions are met; (i) no Event of Default exists, (ii) the Debt Service Coverage Ratio at the time of the prepayment is no less than 1.70:1 (calculated solely with respect to the Loan and exclusive of the Mezzanine Loan), (iii) the Loan to Value is no greater than 65% (calculated solely with respect to the Loan and exclusive of the Mezzanine Loan), (iv) the Loan has no less than twenty-four (24) months remaining prior to the Maturity Date, (v) year-to-year cash flow at the Property has not declined by more than ten percent (10%) and (vi) the funds for such prepayment come from the direct or indirect equity owners in the Mezzanine Loan Borrower or a refinancing of the Mezzanine Loan.

(h)    Borrower, or the assignee/assumptee shall pay any and all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented out-of-pocket attorney fees and expenses) of Lender associated with the Mezzanine Loan and/or the satisfaction of the conditions contained in this Section 2.6.

The failure to satisfy any of the foregoing pre-conditions before obtaining any Future Permitted Mezzanine Debt (to the extent such Future Permitted Mezzanine Debt is in fact obtained despite such failure) shall be an Event of Default hereunder and under the Loan Documents.

## 3.    CASH MANAGEMENT AND RESERVES

**3.1    Cash Management Arrangements.**  (a) Subject to the provisions of Section 3.1(b) below, Borrower shall cause all amounts payable pursuant to the Management Agreement to be transferred directly into the Clearing Account.  If the Management Agreement is terminated and is not replaced with a Replacement Management Agreement, then, pursuant to an instruction letter substantially similar in the form of Schedule 5 attached hereto (the "*Credit Card Direction Letter*"), Borrower or Manager shall immediately instruct each of the credit card companies with which Borrower or Manager has entered into merchant's or other credit card agreements that all Rents payable with respect to the Property, in accordance with such merchant's agreements or otherwise, shall be transferred instead by wire transfer or the ACH system to the Clearing Bank for deposit in the Clearing Account.  Borrower shall also promptly deliver or cause to be delivered a Credit Card Direction Letter to any new credit card companies with which Borrower or Manager enter into merchant's or other credit card agreements. Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with this Agreement.  Funds in the Deposit Account shall be invested at Lender's discretion only.  Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*").  The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the above accounts.

(b)    Notwithstanding the provisions of Section 3.1(a) above, for so long as the Management Agreement remains in effect (or a replacement thereof is entered into in accordance with provisions of this Agreement), the timing and the amounts required to be deposited into the Clearing Account by Borrower and Manager shall equal the aggregate of all amounts payable or distributable to Borrower by Manager pursuant to and in accordance with the Management Agreement.

**3.2    Required Repairs.**

**3.2.1    Completion of Required Repairs.**  Borrower shall perform and complete each

17

item of the repairs and environmental remedial work at the Property described on **Schedule 2** (the "***Required Repairs***") within the time for such item set forth on **Schedule 2**, which period of time shall be extended on a day for day basis to the extent that Borrower is prevented, hindered or delayed in such performance by a Force Majeure.

   **3.2.2 Required Repairs Reserves.** Borrower shall deposit (i) $4,350.00 on the date hereof and (ii) on each Payment Date shown on **Schedule 10** the amount set forth on **Schedule 10**. Borrower shall use such amounts to complete the Required Repairs as set forth on **Schedule 2** and such amounts shall be transferred to a Subaccount (the "***Required Repairs Subaccount***"). Provided no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) a Borrower's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for.

   **3.3 Taxes and Insurance.** (a) Subject to the provisions of Section 3.3(b) below, Borrower shall pay to Lender on each Payment Date (i) one–twelfth of the Taxes that Lender estimates will be payable during the next twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (ii) one–twelfth of the Insurance Premiums that Lender estimates will be payable for obtaining or renewing (as applicable) coverage required by the terms hereof upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***"). Provided that no Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.2 and 7.1, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) promptly reimburse Borrower for such amounts upon presentation of evidence of payment and a Borrower's Certificate in form and substance satisfactory to Lender; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2. In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

   (b) Notwithstanding the provisions of Section 3.3(a), for so long as Manager (or any replacement Manager pursuant to a Replacement Management Agreement approved pursuant to the terms hereof) is directly paying Taxes and Insurance Premiums for all coverages required pursuant to Section

18

7.1.1, Borrower shall not be required to pay the monthly payments required under Section 3.3(a). Lender and Borrower hereby acknowledge and agree that, as of the Effective Date, Manager maintains pursuant to the terms of the Management Agreement such an account for the sole purpose of reserving for Taxes and Insurance Premiums, and the requirements to fund the Tax and Insurance Subaccount are therefore waived unless and until the Management Agreement is terminated and Borrower does not enter into a Replacement Management Agreement that adequately reserves for Taxes and Insurance Premiums pursuant to the terms of this Agreement. The provisions of Subsection (a) shall become fully operative commencing on the next Payment Date after Manager fails to make any Taxes or Insurance Premium payment prior to delinquency.  Borrower acknowledges that as of the date hereof, Borrower is acquiring certain supplemental liability coverages required pursuant to Section 7.1.1 and accordingly Lender is requiring monthly deposits to the Tax and Insurance Subaccount to pay for the Insurance Premiums associated with such supplemental liability coverage.

**3.4**    **FF&E Reserves.**  (a)  Subject to the provisions of Section 3.4(b) below, commencing on the First Payment Date and continuing on each Payment Date thereafter until the Stated Maturity Date, Borrower shall pay to Lender on each Payment Date an amount initially equal to one-twelfth (1/12) of three percent (3.0%) of Gross Revenues generated at the Property for the previous calendar year.  Lender will transfer such amounts into a Subaccount (the "*FF&E Reserve Subaccount*").   The foregoing payments comprise the amounts reasonably estimated by Lender in its sole discretion to be necessary for the purpose of funding repair and replacement of the FF&E and any Approved Capital Expenses (collectively, the "*FF&E Replacements*") that are reasonably necessary or appropriate in accordance with sound hotel management practices in order to keep the Property in operating condition and repair consistent with other hotel properties in the same market segment and in the metropolitan area in which the Property is located and to keep the Property or any portion thereof from deteriorating.  Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the FF&E Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided that (i) such disbursement is for FF&E Replacements; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such FF&E Replacements; and either (iii) the request for disbursement is accompanied by (A) a Borrower's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for FF&E Replacements and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified FF&E Replacements and (z) that any construction work associated with such FF&E Replacements has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation reasonably satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such FF&E Replacements and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender, or (iv) Manager is entitled to such disbursement pursuant to the terms of the Management Agreement.  Any such disbursement of more than $10,000 to pay (rather than reimburse) FF&E Replacements may, at Lender's option, be made by joint check payable to Borrower and the payee on such FF&E Replacements.

(b)    Notwithstanding the provisions of Section 3.4(a), Lender waives the requirement to fund the FF&E Reserve Subaccount if, pursuant to the terms of the Management Agreement, Manager maintains a separate account for the sole purpose of reserving for FF&E Replacements. Lender and Borrower hereby acknowledge and agree that, as of the Effective Date, Manager maintains pursuant to the terms of the Management Agreement such an account for the sole purpose of reserving for FF&E Replacements, and the requirements to fund the FF&E Reserve Subaccount are therefore waived unless

and until the Management Agreement is terminated and Borrower does not enter into a Replacement Management Agreement that adequately reserves for FF&E Replacements pursuant to the terms of this Agreement. The amount of regular deposits to such account must be in accordance with the terms of the Management Agreement.  Upon termination of the Management Agreement and if Borrower does not enter into a Replacement Management Agreement that adequately reserves for FF&E Replacements, Lender shall have the right to direct Borrower and the institution maintaining such current account to transfer all amounts on deposit therein to the FF&E Reserve Subaccount and Borrower shall commence making monthly payments to the FF&E Reserve Subaccount as required by Section 3.4(a).  Borrower shall grant Lender a security interest in all accounts maintained on behalf of Borrower by Manager or Replacement Manager and, upon commencement of a Cash Sweep Period, to the extent Borrower has the right under the Management Agreement, the institutions maintaining such account(s) shall execute a control agreement satisfactory to Lender setting forth Lender's rights to control such account(s) and confirming Lender's security interest therein.

**3.5**    **Intentionally Deleted.**

**3.6**    **Operating Expense Subaccount.**  Funds available in the Deposit Account (after distribution pursuant to 3.10 (a)(i) – (iv)) shall be transferred into a Subaccount (the "*Operating Expense Subaccount*") as provided in Section 3.10.  Provided no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Operating Expense Subaccount to Borrower, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $1,000, provided (i) such disbursement is for an Approved Operating Expense or other operating expenses not paid (or to be paid) by Manager pursuant to the Management Agreement; and (ii) such disbursement is accompanied by (A) a Borrower's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses or operating expenses not paid (or to be paid) by Manager pursuant to the Management Agreement and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have, to Borrower's knowledge, been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses or operating expenses not paid (or to be paid) by Manager pursuant to the Management Agreement, and (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor.  Notwithstanding the foregoing, for so long as Manager (or any replacement Manager pursuant to a Replacement Management Agreement approved pursuant to the terms hereof) is directly paying operating expenses, Borrower shall not be required to pay the monthly payments required under this Section 3.6. Lender and Borrower hereby acknowledge and agree that, as of the Effective Date, Manager maintains pursuant to the terms of the Management Agreement such an account for the sole purpose of reserving for operating expenses, and the requirements to fund the Operating Expense Subaccount are therefore waived unless and until the Management Agreement is terminated and Borrower does not enter into a Replacement Management Agreement that adequately reserves for operating expenses pursuant to the terms of this Agreement.

**3.7**    **Casualty/Condemnation Subaccount.**  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") in accordance with the provisions of Section 7.  All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of Section 7.

**3.8**    **Security Deposits.**  If not separately maintained by Manager, Borrower shall keep all security deposits under Leases  at a separately designated account under Borrower's control at the Clearing Bank so that the security deposits shall not be commingled with any other funds of Borrower (such account, the "*Security Deposit Account*").  Borrower shall, upon Lender's request, if permitted by

applicable Legal Requirements and the Management Agreement, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "***Security Deposit Subaccount***") subject to the terms of the Leases.  Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a Tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

        **3.9**      **Grant of Security Interest; Application of Funds.**  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "***Cash Management Accounts***").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents.  Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Borrower shall be entitled to receive on a semi–annual basis interest on any balance in the Deposit Account and any Subaccounts other than Subaccounts established for the collection of Escrows at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

        **3.10**      **Property Cash Flow Allocation.**

        (a)      Amounts deposited into the Deposit Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority:

        (i)      First, subject to <u>Section 3.3(b)</u>, to make payments into the Tax and Insurance Subaccount as required under <u>Section 3.3</u>;

        (ii)      Second, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

        (iii)      Third, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this <u>Section 3.10(a)</u>, then due to Lender under the Loan Documents), which payments shall be made into a Subaccount (the "***Monthly Debt Service Subaccount***")

to be established for such purpose under the Deposit Account Agreement;

(iv)    Fourth, to make payments into the Seasonal Reserve Subaccount as required under <u>Section 3.13</u>;

(v)    Fifth, to make payments into the Required Repairs Subaccount as required under <u>Section 3.2</u>;

(vi)    Sixth, subject to <u>Section 3.4(b)</u>, to make payments into the FF&E Reserve Subaccount as required under <u>Section 3.4</u>;

(vii)    Seventh, subject to <u>Section 3.1(b)</u>, to make payments for Approved Operating Expenses as required under <u>Section 3.6</u>;

(viii)    Eighth, to make payments into the Façade Reserve Subaccount as required under <u>Section 3.12</u>.

(ix)    Ninth, if Future Permitted Mezzanine Debt has been obtained pursuant to <u>Section 2.6</u>, to pay amounts then payable under the Mezzanine Loan Documents in accordance with written directions received from Mezzanine Lender;

(x)    Tenth, after the consummation of a Secondary Market Transaction, to pay the pro rata portion of the expenses described in <u>Section 9</u>;

(xi)    Eleventh, if a Cash Sweep Period exists, all excess amounts shall be swept to the Cash Collateral Reserve Subaccount to be held in accordance with <u>Section 3.11</u> hereof;

(xii)    Lastly, if no Cash Sweep Period then exists, any excess amounts shall be disbursed to Borrower to a Borrower account designated by Borrower from time to time.

(b)    The failure of Borrower to make all of the payments required under clauses (i) through (viii) of <u>Section 3.10(a)</u> in full on each Payment Date shall constitute an Event of Default under this Agreement.

(c)    Notwithstanding anything to the contrary contained in this <u>Section 3.10</u>, after the occurrence and during the continuance of an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect.

**3.11**    <u>**Cash Collateral Reserve**</u>.  Following the commencement, and at all times during the continuance, of a Cash Sweep Period, all amounts remaining in the Deposit Account after making the payments described in <u>Section 3.10(a)(i)</u> through <u>(x)</u>, if any, shall be deposited into a Subaccount (the "***Cash Collateral Reserve Subaccount***").  All funds deposited into the Cash Collateral Reserve Subaccount shall be held by Lender as additional security for the Debt and Borrower shall have no right to receive any disbursements therefrom.  Notwithstanding the foregoing, upon the termination of any Cash Sweep Period, no further deposits shall be made into the Cash Collateral Reserve Subaccount and, provided that no Event of Default has occurred and is continuing, all amounts then on deposit in the Cash Collateral Reserve Subaccount shall be paid to Borrower.

**3.12**    <u>**Façade Remediation Reserve**</u>.  .  (a) Lender and Borrower acknowledge that repair work is required for the façade of the building's exterior and the roof (the "***Facade Remediation***").  The

extent required of the Façade Remediation will be identified in the Façade Report (defined below). Borrower covenants to complete the Façade Remediation within twenty-four (24) months of the date hereof (prior to December 31, 2018 for any life and safety work identified in the Facade Report), subject to Force Majeure but such additional period not to exceed three (3) months.  The seller of the Property to Borrower limited Borrower's and Lender's access to the Property to fully identify and quantify the Façade Remediation that will be required.  Borrower shall, within fifteen (15) Business Days of the date of this Agreement retain one of the consultants listed on **Schedule 9** to prepare a remediation report (the "***Façade Report***") that specifically identifies the required Façade Remediation required and provides a detailed budget for completion of the Façade Remediation .  A final and complete Façade Report must be delivered to Lender on or before April 1, 2018.  Lender shall have the right to approve or disapprove the Façade Report in its reasonable discretion; provided that any rejection of the Façade Report must be done in good faith and must be accompanied by written explanation detailing the specific reasons for Lender's disapproval.  If Lender fails to respond to Borrower within fifteen (15) Business Days of delivery of the Façade Report to Lender, the Façade Report shall be deemed approved by Lender so long as a cover letter accompanying the delivery of the Façade Report to Lender specifically notifies Lender in bold and capitalized type of the deemed approval consequence of failure to timely respond.

(b)     Borrower shall deposit (i) $2,080,425.00  with Lender on the date hereof and (ii) on each of the first twelve  (12) Payment Dates, the amount set forth on **Schedule 11** hereof; provided, however, if available cash on any Payment Date is insufficient to make the monthly payment required pursuant to this clause (ii), then any shortfall shall be added to the monthly amount to be collected on the subsequent Payment Date (Lender acknowledging that this may cause the amounts required pursuant to this clause (ii) to be collected over more than twelve (12) Payment Dates).  Upon approval of the Façade Report by Lender, Lender shall adjust (up or down) the monthly payment deposit required under clause (ii) above to reflect a new monthly deposit amount (taking into account amounts then on deposit in the Façade Subaccount (as defined below)) such that one hundred and ten percent (110%) of the budgeted amount set forth in the Façade Report will be deposited in the normal course by the December 2018 Payment Date. Lender shall transfer such amounts to a Subaccount (the "***Façade Subaccount***"). Amounts on deposit in the Façade Subaccount shall be additional collateral and security for the Debt.  Provided no Event of Default is continuing, amounts on deposit in the Façade Subaccount shall be made available to reimburse Borrower for, or pay for, incurred costs associated with the Façade Remediation and repair as set forth in the Façade Report.  The Façade Remediation must be completed within the timeframes set forth in the Facade Report and failure to do so shall be an Event of Default.  Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Façade Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided that (i) such disbursement is for Façade Remediation; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Facade  Remediation; and (iii) the request for disbursement is accompanied by (A) a Borrower's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for Facade  Remediation and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified Facade  Remediation and (z) that any construction work associated with such Facade  Remediation has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Facade  Remediation and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender.  Any such disbursement of more than $25,000 to pay (rather than reimburse) Facade  Remediation may, at Lender's option, be made by joint check payable to

Borrower and the payee on such Facade Remediation. Upon written confirmation from the preparer of the Façade Report (or, at Lender's election, Lender's consultant, such confirmation not to be unreasonably withheld) that all Façade Remediation has been completed as required in the Façade Report, amounts remaining on deposit in the Façade Subaccount shall be deposited to the Clearing Account.

**3.13    Seasonal Reserve**. Borrower shall deposit with Lender (i) $980,986.31 on the date hereof and (ii) $980,986.31 on December 5, 2017. Additionally, on each Payment Date occurring in each of the months of May through January inclusive, Borrower shall deposit with Lender an amount equal to one-ninth (1/9th) of the amount (the "***Shortfall Amount***") by which (i) the total amount of all debt service, reserves and all other amounts due and payable to Lender under the Loan Documents on the Payment Dates in the prior February, March and April months, exceeded (ii) the total amount of the Rents deposited into the Clearing Account for such Payment Dates in the prior February, March and April months; provided, however, if the Debt Service Coverage Ratio as determined by Lender on any April Payment Date is not less than 1.70:1, monthly deposits will not be required and Borrower shall make a single deposit of the Shortfall Amount on the December Payment Date. Such amounts shall be deposited by Lender into a Subaccount (the "***Seasonal Reserve Subaccount***"). So long as no Event of Default is continuing, Lender agrees to advance to itself on each Payment Date in February, March and April an amount that when added to the sum of the Rents deposited into the Clearing Account during the applicable Interest Period or otherwise paid by Borrower, shall be sufficient to pay all debt service, reserves and all other amounts due to Lender under the Loan Documents on the respective Payment Date (the "***Required Amounts***"). Provided no Event of Default is continuing, any amounts remaining in the Seasonal Reserve Subaccount after payment of the Required Amounts on the April Payment Date shall be deposited to the Clearing Account. Nothing contained herein, including, without limitation, the existence of the Seasonal Reserve Subaccount, shall release Borrower of any obligation to make payments hereunder or under the other Loan Documents strictly in accordance with the terms hereof or thereof and, in this regard, without limiting the generality of the foregoing, should the amounts contained in the Seasonal Reserve Subaccount not be sufficient to pay in full the amounts due to Lender hereunder or under the other Loan Documents, Borrower shall be responsible for paying such deficiency on the Payment Date of any such monthly installment. Additionally, to the extent monthly revenues collected at the Property change on an ongoing and regular basis, Lender and Borrower shall work together in good faith to readjust the required deposits to and disbursements from the Seasonal Reserve Subaccount.

## 4.    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof that:

**4.1    Organization; Special Purpose.** Each of Borrower and Borrower Representative has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses (including, without limitation, any applicable liquor license or hotel operator licenses), permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Each of Borrower and Borrower Representative is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations. Borrower is a Special Purpose Entity.

**4.2    Proceedings; Enforceability.** Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents. The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity. The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set–off,

counterclaim or defense, including the defense of usury.  No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

4.3    **No Conflicts.**  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

4.4    **Litigation.**  Other than as disclosed in **Schedule 7**, there are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, Borrower Representative, or to Borrower's knowledge, the Manager or the Property, which, if adversely determined, could reasonably be anticipated to materially adversely affect the condition (financial or otherwise) or business of Borrower, Borrower Representative, Manager or the condition or ownership of the Property.

4.5    **Agreements.**  Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties, operations or condition, financial or otherwise.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

4.6    **Title.**  Upon closing of the acquisition of the Property, Borrower shall have good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or concurrently herewith will be paid.  The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid or concurrently herewith will be paid.  To Borrower's knowledge, no Condemnation or other proceeding has been commenced or is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property.  To Borrower's knowledge, there are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.  To Borrower's knowledge, there are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property.  To Borrower's knowledge, the survey for the Property delivered to Lender does not fail to reflect any material matter affecting the Property or the title thereto.  To Borrower's knowledge all of the

25

Improvements included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvement on an adjoining property encroaches upon the Property, and no easement or other encumbrance upon the Property encroaches upon any of the Improvements, except those insured against by the title insurance policy insuring the Lien of the Security Instrument.  Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.  To Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

4.7     **No Bankruptcy Filing.**  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "***Bankruptcy Proceeding***"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it.  In addition, neither Borrower nor Borrower Representative nor any principal nor Affiliate of either has been a party to, or the subject of a Bankruptcy Proceeding for the past ten years.

4.8     **Full and Accurate Disclosure.**  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not materially misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and to Borrower's knowledge, the Property (i) are true, complete and correct in all material respects, (ii) accurately represent in all material respects the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long–term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or, to Borrower's knowledge, the Property from that set forth in said financial statements.

4.9     **No Plan Assets.**  Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3–101.

4.10     **Compliance.**  Borrower and, to Borrower's knowledge and other than as disclosed in any property zoning report delivered to Lender, the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances).  To Borrower's knowledge, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. The Property is used primarily for hospitality and other appurtenant and related uses.  To Borrower's knowledge and other than as disclosed in any property zoning report delivered to Lender, in the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  To Borrower's knowledge, no legal proceedings are pending or threatened with respect to the zoning of the Property.  To Borrower's knowledge, neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any

property other than the Property and as set forth on the Zoning Lot Development Agreement dated as of January 7, 2005 by and between 55 Little West 12 St. Corp., a New York corporation, and AB Green Gansevoort, LLC, a Delaware limited liability company, as nominee for and on behalf of Gansevoort Standard Hotel Partners LLC, a Delaware limited liability company. To Borrower's knowledge, and other than as disclosed in any property zoning report delivered to Lender, all certifications, permits, licenses (excluding the applicable liquor license, which will be transferred to Borrower when and as provided in the purchase agreement for the Property and hotel operator and Manager licenses) and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "*Licenses*"), the lapse of which could reasonably be anticipated to have a material adverse effect on the operation of the Property, have been obtained and are in full force and effect. To Borrower's knowledge, and other than as disclosed in any property zoning report delivered to Lender, the use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

        **4.11**     **Contracts.**  There are no service, maintenance or repair contracts affecting the Property ("*Contracts*") that are not terminable on 60 days' (90 days in the case of Contracts assumed on the date hereof by Borrower) notice or less without cause and without penalty or premium except the Management Agreement and those Contracts that the Manager has the authority to enter pursuant to the terms of the Management Agreement. All Contracts affecting the Property entered into by Borrower have been entered into at arm's–length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

        **4.12**     **Federal Reserve Regulations; Investment Company Act.**  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

        **4.13**     **Utilities and Public Access.**  To Borrower's knowledge, (i) the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses, (ii) all public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right–of–way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement and (iii) all roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

        **4.14**     **Physical Condition.**  To Borrower's knowledge and other than as disclosed in any property condition report delivered to Lender, the Property, including all Improvements, parking facilities, systems, Equipment and landscaping, are in good condition, order and repair in all material respects; there exists no structural or other material defect or damages to the Property, whether latent or otherwise. Borrower has not received notice from any insurance company or bonding company of any defect or inadequacy in the Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond. To Borrower's knowledge, no portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

**4.15    Leases.**  Borrower has delivered to Lender a true, correct and complete rent roll for the Property (the "***Rent Roll***"), which includes all Leases known by Borrower to be affecting the Property. To Borrower's knowledge, except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the Tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the Tenant thereunder for an adjustment to the rent; (v) no Tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) there is no present material default by the Tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and will be held consistent with Section 3.8, as of Borrower's acquisition of the Property; (viii) Borrower will be, as of its acquisition of the Property, the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of Borrower and the applicable Tenant thereunder, subject to principles of law and equity; (x) other than those permitted to occupy the Property as part of a Hotel Transaction, no Person has any possessory interest in, or right to occupy, the Property except under the terms of a Lease; and (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement.  None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.  Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except (x) Tenants with respect to the Rents for the Leases, (y) any Persons who have paid a deposit or advance with respect to a future Hotel Transaction, and (z) any Persons entitled to receive any gratuities or service charges.  Notwithstanding the foregoing, Borrower represents that as of the date of this Agreement, there are no Leases in effect with respect to the Property.

**4.16    Fraudulent Transfer.**  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**4.17    Ownership of Borrower.**  The organizational chart attached hereto as **Schedule 3** is complete and accurate.

**4.18    Management Agreement.**  The Management Agreement is in full force and effect. There is no default, breach or violation existing thereunder by Borrower, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by Borrower.  To Borrower's knowledge, Manager is not in default of the Management Agreement.  The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents to the extent as set

forth in the Manager Subordination Agreement.

**4.19    Hazardous Substances.**    To the best of the knowledge of Borrower, other than as disclosed to Lender in any Phase I environmental report delivered to Lender (i) the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean–up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right–to–Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the environmental provisions of the Occupational Safety and Health Act, any Legal Requirements relating to Toxic Mold, any state super–lien and environmental clean–up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "***Hazardous Substances***"); (iii) after due inquiry, no Hazardous Substances (excluding common household and commercial cleaning supplies and chemicals in de minimis qualities and other Hazardous Substances normally found in properties similar to the Property stored or maintained in compliance with all Environmental Laws) are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than the kinds and amounts ordinarily used or stored in similar properties for purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws; (iv) after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

**4.20    Principal Place of Business.**    The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business.

**4.21    Other Debt.**    There is no indebtedness with respect to the Property or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.22    Embargoed Person.**    None of the funds or assets of Borrower, Borrower Representative or any Guarantor, as applicable, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

**4.23    Anti–Money Laundering.**    None of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the

Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

     **4.24**   **Liquor License**.  Borrower's interest in the liquor license for the Property (if any) is not subject to any Liens or encumbrances superior to, or of equal priority with, the Security Instrument.

     **4.25**   **Property Improvement Plan**. There is currently no property improvement plan or other similar requirement imposed under the Management Agreement.

     **4.26**   **Personal Property**.  Either Borrower or Manager owns all personal property necessary to operate the Property in the manner it is currently operated.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.19 shall survive in perpetuity.

## 5.   COVENANTS

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

     **5.1**   **Existence.**  Each of Borrower and Borrower Representative shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises to the extent the lapse of which could reasonably be anticipated to cause a material adverse effect on the operation of the Property, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses to the extent the lapse of which could reasonably be anticipated to cause a material adverse effect on the operation of the Property, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

     **5.2**   **Taxes.**  Borrower shall pay or shall cause Manager to pay, all Taxes prior to delinquency, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes have been so paid no later than thirty (30) days after they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender or Manager pursuant to Section 3.3).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in imminent danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes, together with all interest and penalties thereon, which shall not be less than one hundred twenty–five percent (125%) of the Taxes being contested, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes, together with all costs, interest and penalties; provided, however, so long as there is then no Event of Default continuing, Borrower may request and

Lender shall release any security so deposited to satisfy any such contested Taxes.

**5.3**    **Repairs; Maintenance and Compliance; Alterations.**

**5.3.1    Repairs; Maintenance and Compliance.**  Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.3.2 and normal wear and tear and replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply in all material respects with all Legal Requirements and the Management Agreement and promptly cure or cause Manager to cure properly any known violation of a Legal Requirement and the Management Agreement.  Borrower shall notify Lender in writing within one Business Day after Borrower first receives notice of any such non–compliance.  Subject to Lender's obligations under Article 3, Borrower shall promptly repair, replace or rebuild, or cause Manager to promptly repair, replace or rebuild, any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.3.2    Alterations.**  Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property and (iii) are in the ordinary course of Borrower's business.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed.  Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred twenty-five percent (125%) of the cost of the Material Alteration as estimated by Lender.  The conditions to disbursement set forth in Section 3.2.2 shall apply mutatis mutandis to the disbursement of the security for payment of Material Alterations required in this Section 5.3.2.  Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued.  Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.3.2.

**5.4    Performance of Other Agreements.**  Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**5.5    Cooperate in Legal Proceedings.**  Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which could be reasonably determined to affect the rights of Lender under any Loan Document.

**5.6    Further Assurances.**  Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes

of the Loan Documents, as Lender may reasonably require from time to time (including, without limitation, the executing and delivering all such writings necessary to transfer any liquor licenses with respect to the Property into the name of Lender or its designee after the occurrence of an Event of Default); and (ii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Borrower Representative and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

    **5.7**    **Environmental Matters.**

        **5.7.1**    **Hazardous Substances.**  So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances (excluding common household and commercial cleaning supplies and chemicals in de minimis qualities and other Hazardous Substances normally found in properties similar to the Property stored or maintained in compliance with all Environmental Laws) and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property might pose a threat to the health, safety or welfare of humans from Hazardous Substances and (iii) remove such Hazardous Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be reasonably required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

        **5.7.2**    **Environmental Monitoring.**

        (a)    Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith; provided, however, absent an actual conflict of interest, Lender agrees that Borrower's counsel shall not be prohibited ab initio from representing both Borrower and Lender.

        (b)    Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or

audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring.  If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)    If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender. If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence or cause to be commenced all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute or cause to be prosecuted to completion all such Remedial Work within such period of time as may be required under applicable law.  All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not timely commence and diligently prosecute, or cause to be commenced and diligently prosecuted, to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense.  Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty–five percent (125%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.  Upon resolution of any such contest, provided there is then no Event of Default continuing, Borrower may request and Lender shall release any security so deposited to satisfy any such contested Remedial Work.

(d)    Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8    Title to the Property; Liens.**  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents,

33

subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower or, except in connection with Future Permitted Mezzanine Financing, Borrower Representative, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

5.9 **Leases.**

      5.9.1 **Generally**. Upon request, Borrower shall furnish (or cause Owner to furnish) Lender with executed copies of all Leases then in effect. All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to then existing local market rates and shall be arm's length transactions with bona fide, independent third–party Tenants.

      5.9.2 **Leases**. Borrower shall not enter into a proposed Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed. Notwithstanding the foregoing, Lender's prior consent shall not be required for a Lease that satisfy either of the following criteria: (i) the Lease term is for no longer than twelve (12) months and the aggregate of such Leases demises space not to exceed more than seven thousand (7,000) square feet or (ii) the Lease term is for no longer than thirty (30) days and the aggregate of such Leases demises space not to exceed three (3) floors of hotel space.

5.10 **Estoppel Statement.** After request by Lender, but no more than once in any twelve (12) calendar months, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) that to Borrower's knowledge, no Event of Default is continuing under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

5.11 **Management Agreement.**

      5.11.1 **Affirmative Covenants.** The Improvements shall be operated under the terms and conditions of the Management Agreement. Borrower shall (i) pay all sums required to be paid by Borrower under the Management Agreement, (ii) diligently perform, observe, and enforce all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Management Agreement, (iii) promptly notify Lender of any default under the Management Agreement of which Borrower is aware and notify Lender of the giving of any notice to Borrower of any default by Borrower in the performance or observance in any material respect of any of the terms, covenants or conditions of the Management Agreement on the part of Borrower to be performed and observed and deliver to Lender a true copy of each such notice, (iv) promptly deliver to Lender a copy of each Operating Budget, financial statement, budget, projection, business plan, property improvement plan, capital expenditure plan, notice, report (including but not limited to Pace reports), Quality Assurance Report, operation projection and estimate, in each case to the extent received by Borrower under the Management Agreement, as and when received by Borrower, and (v) promptly enforce in a commercially reasonable manner the performance and observance of all of the material covenants required to be performed and observed by the Manager under the Management Agreement.

      5.11.2 **Negative Covenants.** Borrower shall not, without the prior consent of Lender,

which will not be unreasonably withheld, conditioned or delayed, (a) surrender, terminate or cancel the Management Agreement; (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement; (provided Borrower may waive late fees and default interest that may be owed by Manager to the extent such waiver would be in the ordinary course of Borrower's relationship with Manager); or (e) suffer or permit the occurrence of continuance of a default beyond any applicable cure period under the Management Agreement if such default permits Manager to terminate or cancel the Management Agreement.  In addition, without Lender's prior consent (unless Lender has consented to the Annual Budget in which case prior consent shall not be required), Borrower shall not approve any budget requiring Borrower approval under the Management Agreement. Borrower shall provide Lender with a monthly deposit, withdrawal and balance history for all reserve funds established pursuant to the Management Agreement including without limitation, any working capital account and any equivalent account maintained for FF&E Replacements maintained under the Management Agreement.  Notwithstanding the foregoing, Lender's prior consent shall not be required for the payment by Manager of costs and expenses that require immediate payment due to life safety concerns or for any emergency occurring at the Property, as contemplated in the Management Agreement, or as provided in Section 5.3.2 hereof. Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.  Borrower shall not exercise any rights, make any decisions, grant any approvals (including, without limitation, the approval of any property improvement plan or capital expense expenditure that requires Borrower's approval) or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

      **5.11.3**  **Rights of Lender.**  To the extent assignable, Borrower hereby assigns to Lender as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Agreement, all the rights, privileges and prerogatives of Borrower to surrender the Management Agreement or to terminate, cancel, modify, change, supplement, alter or amend the Management Agreement, and any such surrender of the Management Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Management Agreement without the prior consent of Lender shall be void and of no force and effect.  Borrower shall not enter into any management, franchise or similar agreement other than the Management Agreement without the prior written consent of Lender (which will not be unreasonably withheld, conditioned or delayed).  If (i) an Event of Default has occurred and is continuing (ii) Manager shall become insolvent or the subject of any proceeding under any state or federal bankruptcy or insolvency law or for the liquidation of all or a major portion of its property, or (iii) an event of default by Manager occurs under the Management Agreement, or Manager is grossly negligent or commits malfeasance and the same is an event of default under the Management Agreement, provided in each case that Borrower has the right to do so under the Management Agreement or the Manager Subordination Agreement, Borrower shall, at the request of Lender, terminate the Management Agreement and replace the Manager with a Qualified Manager and, if applicable, a Qualified Franchisor pursuant to a Replacement Management Agreement and, if applicable, a Replacement Franchise Agreement.

      **5.11.4**  **Default; Right to Cure.** If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Management

Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Management Agreement shall be kept unimpaired and free from default.  Subject to reasonable notice and rights of Tenants and transient occupants at the Property, Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action.  If Manager shall deliver to Lender a copy of any notice sent to Borrower of default under the Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Borrower shall, from time to time, use its best efforts to obtain from Manager such certificates of estoppel with respect to compliance by Borrower with the terms of the Management Agreement as may be requested by Lender. Borrower shall exercise each individual option, if any, to extend or renew the term of the Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender as its attorney-in-fact to, upon and during the continuance of an Event of Default, exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Any sums expended by Lender pursuant to this paragraph shall bear interest at the Default Rate from the date that is ten (10) days from written demand to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

      **5.11.5** <u>**Management Agreement Replacement.**</u>  In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination, surrender, cancellation, release, amendment, or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with Manager or another Qualified Manager (and, if applicable, a Qualified Franchisor).  In connection therewith, Borrower shall cause Manager or such other Qualified Manager, as applicable, to enter into a subordination agreement in form and substance reasonably acceptable to Lender, and, to the extent Borrower also enters into a Replacement Franchise Agreement, Borrower shall also cause the applicable Qualified Franchisor to deliver to Lender a franchisor comfort letter in form and substance reasonably acceptable to Lender.

      **5.11.6** <u>**Approvals.**</u>  In connection with any requested approval sought under this <u>Section 5.11</u>, if within ten (10) Business Days after Lender's receipt of Borrower's written request for such approval stating in bold uppercase letters at the top of such notice: "TIME SENSITIVE RESPONSE REQUIRED WITHIN 10 BUSINESS DAYS OF RECEIPT OR DEEMED APPROVAL MAY OCCUR", together with any and all required information and documentation relating thereto as may be reasonably required in order to approve such matter (collectively, the "***Management Approval Information***"), Lender does not approve or disapprove such matter (disapproval to include reasons), Borrower may deliver a second notice to Lender, together with a second copy of the Management Approval Information, stating in bold uppercase letters: "PURSUANT TO THE TERMS OF SECTION 5.11.6 OF THE LOAN AGREEMENT EXECUTED BY GC SHL, LLC, AS BORROWER, DATED OCTOBER 27, 2017, LENDER HAS FAILED TO RESPOND TO THE REQUEST FOR APPROVAL. FAILURE OF LENDER TO RESPOND TO BORROWER'S REQUEST FOR SUCH APPROVAL WITHIN 5 BUSINESS DAYS OF RECEIPT OF THIS SECOND NOTICE SHALL BE DEEMED TO BE LENDER'S APPROVAL OF SUCH MATTER".  If Lender fails to approve or disapprove (which such disapproval shall include reasons) of such matter within such additional five (5) Business Day period, such matter shall be deemed approved by Lender.  If the request of Borrower is to approve the replacement of Manager or any Qualified Franchisor and Lender rejects the proposed replacement, Lender shall as soon as commercially reasonable provide a written list of potentially acceptable Qualified Managers and/or Replacement Franchisors to Borrower.

**5.12     Special Purpose Entity.**  Borrower shall at all times be a Special Purpose Entity.  A "***Special Purpose Entity***" shall have the meaning set forth on **Schedule 4** hereto.  Borrower covenants and agrees that Borrower shall provide Lender with five (5) Business Days' prior written notice prior to the removal of an Independent Director or Independent Manager, as applicable, of any Borrower or Borrower Representative.

**5.13     Assumption in Non–Consolidation Opinion.**  Borrower and Borrower Representative shall each conduct its business so that the assumptions (with respect to each Person) made in that certain substantive non–consolidation opinion letter dated the date hereof delivered by Borrower's counsel in connection with the Loan, shall be true and correct in all respects.

**5.14     Change In Business or Operation of Property.**  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a hospitality property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.15     Certain Prohibited Actions.**  Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice; (ii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment (provided, however, nothing herein shall be deemed to prohibit Borrower from waiving default interest or late fees owed Borrower in the ordinary course); (iii) Transfer any License required for the operation of the Property; or (iv) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

**5.16     Prohibited Transfers.**  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Notwithstanding the foregoing, Lender shall not withhold its consent to a sale of the Property (which sale may be effected through transfers of direct or indirect equity interests in Borrower) in its entirety (a "***Special Transfer***"), from time to time either directly to a Special Purpose Entity with organizational documents containing provisions satisfying Lender's then–current requirements of a Special Purpose Entity and otherwise acceptable to Lender or indirectly through the assignment of the direct or indirect beneficial ownership interests in Borrower to a Person otherwise acceptable to Lender, in its reasonable discretion (in each case, the "***Buyer***"), provided that:

(a)     No Event of Default is then continuing;

(b)     Borrower gives Lender written notice of the terms of such prospective Special Transfer not less than thirty (30) days before the date on which such sale is scheduled to close, accompanied by all information concerning the proposed Buyer as Lender would require in evaluating an initial extension of credit to a borrower and such customary and reasonable non–refundable application fee as shall be required by Lender.  Lender shall have the right to approve or disapprove the proposed Buyer in its reasonable discretion (it being acknowledged that Lender may, as a condition to approving any proposed Buyer, require a Rating Comfort Letter from each of the Rating Agencies);

(c)     Borrower or Buyer pays, or causes to be paid, Lender, concurrently with the closing of such Special Transfer, a non refundable assumption fee in an amount equal to all out–of–pocket costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Lender in connection with the Special Transfer plus an amount equal to (i) one-quarter of one percent (0.25%) of the then outstanding Principal on the first such completed Special Transfer, or (ii) one percent (1.0%) of the then outstanding Principal on each completed Special Transfer thereafter;

(d)     Buyer assumes or acknowledges, as applicable, all of the obligations of Borrower under this Agreement, the Note and the other Loan Documents and, prior to or concurrently with the closing of such Special Transfer, Buyer executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption or acknowledgement, as applicable, and delivers such legal opinions as Lender may require;

(e)     Borrower and Buyer execute and cause to be filed in such public records as Lender deems appropriate, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

(f)     Borrower causes to be delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's title insurance policy, property and liability insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Special Transfer, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the Lien of the Security Instrument, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in clause (d) of this Section 5.16, with no additional exceptions added to such policy (except as permitted hereby and for Permitted Exceptions) and insuring that fee simple title to the Property remains vested in Borrower or has been vested in Buyer;

(g)     Borrower executes and delivers to Lender, without any cost or expense to Lender, a release of Lender, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents through and including the date of the closing of the Special Transfer, which agreement shall be in form and substance satisfactory to Lender and shall be binding upon Buyer;

(h)     Such Special Transfer is not construed so as to relieve Borrower of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer and Borrower executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate the ratification of said personal liability.  Borrower shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(i)     Such Special Transfer is not construed so as to relieve any Guarantor of its obligations under any Loan Document, until a direct or indirect member, partner or shareholder of Buyer approved by Lender in its sole discretion (a "***Successor Guarantor***") assumes the obligations of such Guarantor and executes such documents as may be required by Lender to evidence such assumption. Guarantor shall be released from and relieved of any of its obligations under any indemnity or guaranty executed in connection with the Loan for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

38

(j)      Buyer has furnished to Lender all appropriate documents and instruments evidencing Buyer's capacity and good standing, and the authority of the signers to execute the assumption of the Loan and the Loan Documents, which documents and instruments shall include certified copies of all documents and instruments relating to the organization and formation of Buyer and of the entities, if any, which are direct or indirect members, partners or shareholders of Buyer, all of which shall be satisfactory to Lender;

(k)      Buyer shall assume or acknowledge, as applicable, the obligations of Borrower under any management agreements pertaining to the Property, if necessary, or shall cause the new manager and management agreement to satisfy the requirements of Section 5.11 hereof, as applicable;

(l)      Buyer shall furnish an opinion of counsel satisfactory to Lender that the acquisition of the Property or the direct or indirect beneficial owner interests in Borrower, as applicable, and the assumption of the Loan and the Loan Documents by Buyer and, to the extent applicable, Successor Guarantor, was validly authorized, and duly executed and delivered, and constitutes the legal, valid and binding obligations of Buyer and Successor Guarantor, enforceable against each of them in accordance with their respective terms, and with respect to such other matters as Lender may require;

(m)      Buyer shall provide Lender with a fully executed copy of (1) the deed covering the Property or the assignment of direct or indirect beneficial ownership interests in Borrower, as applicable, (2) a bill of sale covering the personal property constituting a part of the Property, if necessary, and (3) an assignment and assumption agreement in respect of the Leases, if necessary, in form and substance reasonably satisfactory to Lender;

(n)      Buyer, at its sole cost and expense, shall furnish to Lender a new substantive non-consolidation opinion with respect to such Buyer in form and substance satisfactory to Lender and the applicable Rating Agencies; and

(o)      To the extent not previously exercised, Buyer may exercise Borrower's rights to obtain a Future Permitted Mezzanine Loan, subject to satisfaction of the conditions set forth in Section 2.6 hereof.

**5.17    Expenses.**  Borrower shall reimburse Lender upon receipt of notice for all reasonable out–of–pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender or Borrower; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the

Loan in the nature of a "work–out", or any insolvency or bankruptcy proceedings; (x) the fees and expenses of any special servicer retained in respect of the Loan and (xi) any assignment of or franchisor/manager consent or approval related to any comfort letter/tri-party agreement/non-disturbance agreement/assignment of franchise agreement and subordination of franchise fees or similar agreement in connection with an assignment, pledge, participation or transfer of the Loan.  Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this <u>Section 5.17</u> shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

      **5.18**    <u>**Indemnity.**</u>  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, (excluding consequential, punitive, special and exemplary damages), penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument or any of the other Loan Documents, or the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder if and to the limited extent that it is finally judicially determined that such Indemnified Liabilities arose solely from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this <u>Section 5.18</u> shall be payable on demand and shall bear interest at the Default Rate from the date that is ten (10) days from demand until paid.  The obligations and liabilities of Borrower under this <u>Section 5.18</u> shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.19     Embargoed Person.**  (a)  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or assets of Borrower, Borrower Representative or Guarantor, whether or not used to repay the Loan, shall constitute property of, or shall be beneficially owned directly or, to Borrower's best knowledge, indirectly, by any person, entity or government subject to sanctions or trade restrictions under United States law ("*Embargoed Person*" or "*Embargoed Persons*") that are identified on (A) the "List of Specially Designated Nationals and Blocked Persons" maintained by the Office of Foreign Assets Control ("*OFAC*"), U.S. Department of the Treasury's FINCEN list, or to Borrower's best knowledge, as of the date thereof, based upon reasonable inquiry by Borrower, on any other similar list maintained by OFAC or FINCEN pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law, or the Loan made by Lender would be in violation of law, or (B) Executive Order 13224 (September 23, 2001) issued by the President of the United States ("Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), any related enabling legislation or any other similar Executive Orders, and (ii) no Embargoed Person shall have any direct interest or, to Borrower's best knowledge, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or any Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

(b)     At all times throughout the Term of the Loan, none of any of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with any of Borrower, Borrower Representative or Guarantor, nor any Person having a beneficial interest in, or for whom any of Borrower, Borrower Representative or Guarantor is acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the Financial Action Task Force ("*FATF*"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank."

(c)     None of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with Borrower, Borrower Representative or Guarantor is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the USA PATRIOT Act (i.e., the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107–56, as may be amended).  For the purposes of this subsection (c), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government–owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in–laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**5.20    Anti–Money Laundering.**  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**5.21    ERISA.**  At all times throughout the Term, upon the request of Lender or any of Lender's successors, assigns or participants in the Loan, the management of Borrower shall consult with Lender or any of Lender's successors, assigns or participants on significant business issues relating to the operation of the Property and make itself available quarterly either personally or by telephone at mutually agreeable times for such consultation; provided, however, that such consultation need not result in any change in Borrower's course of action, subject to Section 8.1.  The aforementioned consultation rights are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3–101.

**5.22    Hotel Operation.**  Without in any way limiting the covenants set forth elsewhere in the Loan Documents, Borrower shall:  (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property and (ii) maintain or cause Manager to maintain Inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

**5.23    Cooperation with Regard to Liquor Licenses.**  To the extent permitted by applicable Legal Requirements and the Management Agreement, Borrower shall (and shall cause Manager and/or any applicable Affiliates of Borrower to) execute and deliver to Lender such additional documents, instruments, certificates, assignments and other writings, and otherwise provide (and cause Manager and/or any applicable Affiliates of Borrower to provide) such cooperation, in each case as may be necessary to transfer any liquor licenses or other Licenses with respect to the Property into, or obtain the issuance of new Licenses in, the name of Lender or its designee upon completion of a foreclosure or deed in lieu thereof, in each case to the extent permitted by Legal Requirements applicable thereto.  Such cooperation shall include, to the extent permitted by applicable Legal Requirements and the Management Agreement, without other limitation, completing transfer requests, surrendering or cancelling any existing Licenses, and making representatives of Borrower, Manager, and their respective Affiliates available for meetings with any applicable Governmental Authority in connection with the transfer or issuance of such Licenses, subject in all instances to applicable Legal Requirements.  Furthermore, neither Borrower nor any of its Affiliates shall intentionally hinder or interfere with the License transfers or issuances made or contemplated by this Agreement, or with efforts of Lender or its successors and assigns to obtain temporary or permanent Licenses.  Upon any such foreclosure or deed in lieu, Borrower hereby irrevocably appoints Lender as its agent and attorney-in-fact to execute all such documents and instruments as Lender shall require or deem advisable in order to cause the transfer or issuance of such Licenses as Lender may require (and to the extent permitted by applicable Legal Requirements) and to cause a cancellation of such existing Licenses as Lender may require.  The foregoing power of attorney is coupled with an interest and shall be irrevocable.  In addition to all other remedies which Lender may have at law or in equity for the enforcement of the terms and provisions of this Agreement, Borrower

expressly agrees that Lender shall have the right to bring an action in specific performance to enforce each and every term and provision of this <u>Section 5.23</u>.

       5.24   <u>**Mezzanine Loan**</u>.  Upon the occurrence of Future Permitted Mezzanine Debt:

       (a)   There shall not occur during the Term any amendment, modification, restatement or supplementation of any term, covenant or condition of the Future Permitted Mezzanine Loan or the Mezzanine Loan Documents except as consented to by Lender in writing, which consent shall not be unreasonably withheld, conditioned or delayed.

       (b)   There shall be provided to Lender, promptly after the receipt or delivery, as the case may be, of same, a copy of any material written notice received or sent by the Mezzanine Loan Borrower with respect to the Mezzanine Loan, it being agreed that any written notice of default, whether actual, alleged or potential, shall be deemed a material notice for the purpose of this <u>Section 5.24</u>.

       5.25   <u>**Collective Bargaining Agreement**</u>.  Borrower shall have the right to enter into a collective bargaining agreement with Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

       5.26   <u>**Façade Remediation**</u>.  Borrower shall complete all Façade Remediation work on or before the applicable deadlines set forth as required in <u>Section 3.12</u> hereof.  Borrower shall take all commercially reasonable actions to obtain written confirmation from the appropriate Governmental Authority that all appropriate filings with respect to the façade will be made in connection with Borrower's performance of the Façade Remediation, including, without limitation, a "Local Law 11" filing.

## 6.   <u>NOTICES AND REPORTING.</u>

       6.1   <u>**Notices.**</u>  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, by email, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):  If to Lender: Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, Telecopier: (212) 891–5777, with copies to: Nelson Mullins Riley & Scarborough LLP, 301 S. College Street, Suite 2300, Charlotte, North Carolina 28202, Attention: Jonathan J. Nugent, Esq. Telecopier: (704) 417–3237, email: jonathan.nugent@nelsonmullins.com, if to Borrower: c/o 818 West 7th Street, Suite 410, Los Angeles, California 90017, Attention: Valerie Yip, Telecopier: (213) 213-8601, email: vyip@gawcapitalusa.com, with a copy to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention: Christopher L. Hartmann, Esq., Telecopier: (212) 446-6460, email: christopher.hartmann@kirkland.comm.  A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; (d) in the case of email, when sent, provided that a copy of such email is also sent within one (1) Business Day thereafter to the intended addressee by means of either hand delivery, registered or certified mail, or overnight delivery, or (e) in the case of facsimile transmission, when sent and electronically confirmed.

       6.2   <u>**Borrower Notices and Deliveries.**</u>  Borrower shall (a) give prompt written notice to

Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Borrower Representative which might materially adversely affect Borrower's or Borrower Representative's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's or Borrower Representative's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Borrower Representative, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall (x) furnish to Lender within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) use commercially reasonable efforts to furnish to Lender within thirty (30) days, Tenant estoppel certificates addressed to Lender, its successors and assigns from each Tenant at the Property in form and substance reasonably satisfactory to Lender, and (z) use commercially reasonable efforts to furnish to Lender within thirty (30) days, an estoppel certificate from Manager stating that (1) the Management Agreement is in full force and effect, and (2) to the best knowledge of Manager, Borrower is not in default under any of the terms, covenants or provisions of the Management Agreement and Manager knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Management Agreement.

**6.3**   **Financial Reporting.**

**6.3.1**   **Bookkeeping.**  Borrower shall keep on a calendar year basis, in accordance with GAAP  (as the same may be modified by the USALI) or any other accounting method, consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall reasonably require.  During the continuance of an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2**   **Annual Reports.**   Borrower shall furnish to Lender annually within one hundred-twenty (120) days of the end of calendar year, unaudited financial statements of Borrower in form and content reasonably acceptable to Lender, prepared in accordance with GAAP (as the same may be modified by the USALI) or any other accounting method, consistently applied, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request.  Each such statement shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income and shall be accompanied by a Borrower's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly in all material respects the financial condition of the Property and has been prepared in accordance with GAAP (as the same may be modified by the USALI) or any other accounting method consistently applied and (2) whether (to Borrower's knowledge) there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

**6.3.3    Monthly Reports.**  Borrower shall furnish to Lender within sixty (60) days after the end of each calendar month the following items: (i) monthly and year–to–date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP (as the same may be modified by the USALI) or any other accounting method, consistently applied, to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender in its reasonable discretion; (ii) a balance sheet for such calendar month; (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year–to–date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year–to–date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar quarter as of the last day of such calendar quarter; (v) a statement that Borrower has not incurred any indebtedness other than indebtedness permitted hereunder; (vi) an aged receivables report and (vii) rent rolls identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year–by–year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and a delinquency report for monthly occupancy statistics for the Property (including an average daily room rate and RevPAR calculations), (viii) monthly, the most current Smith Travel Research Reports (or, if Smith Travel Research Reports are no longer produced, a replacement thereof reasonably acceptable to Lender) then available to Borrower, reflecting market penetration and relevant hotel properties competing with the Property and (ix) monthly, all Quality Assurance Reports of inspection or compliance received by Borrower in such month from Manager under the Management Agreement.  Each such statement shall be accompanied by a Borrower's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP (as the same may be modified by the USALI) or any other accounting method, consistently applied (subject to normal year–end adjustments) and (2) whether (to Borrower's knowledge) there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

**6.3.4    Other Reports.**  Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Borrower Representative or Manager as may be reasonably requested by Lender or any applicable Rating Agency (provided that with respect to the operation of the Property or in the case of Manager, only to the extent any such information is not in Borrower's possession and is required to be provided by Manager to Borrower pursuant to the Management Agreement, in which event notwithstanding the ten (10) Business Day period set forth herein, such information shall be provided to Lender) promptly after receipt from Manager.

**6.3.5    Annual Budget.**  Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender by December 15th of each year during the Term for approval by Lender, which approval shall not be unreasonably withheld or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "**Annual Budget**"), provided that, as it relates to items covered by the Management Agreement only, Lender's rights of approval shall be subject to the limitations set forth in the Management Agreement, and, promptly after preparation thereof, any revisions to such Annual Budget.  To the extent of any dispute as to the Annual Budget, the prior year's Annual Budget shall be deemed to continue in effect for the current period for the disputed items, (a) adjusted by the lesser of (1) the CPI Increase (as defined in the Management Agreement) and (2) the Percentage Increase (as defined in the Management Agreement), in each case over the fiscal year that just ended, (b) adjusted by the actual increases in utility, tax, insurance or similar uncontrolled third-party costs and (c) subject to anticipated increases to operating expenses as a result of increases or projected increases in occupancy at the Property.  The Annual Budget shall consist of (i) an operating expense budget (the

"*Operating Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses whether covered under the Management Agreement or otherwise (on a cash and accrual basis), including amounts required to establish, maintain or increase any monthly payments required hereunder, and (ii) a Capital Expense budget (the "*Capital Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of anticipated Capital Expenses. In connection with any requested approval sought under this Section 6.3.5, if within seven (7) Business Days after Lender's receipt of Borrower's written request for such approval stating in bold uppercase letters at the top of such notice: "TIME SENSITIVE RESPONSE REQUIRED WITHIN 7 BUSINESS DAYS OF RECEIPT OR DEEMED APPROVAL MAY OCCUR", together with any and all required information and documentation relating thereto as may be reasonably required in order to approve such matter (collectively, the "*Budget Approval Information*"), Lender does not approve or disapprove such matter (disapproval to include reasons), Borrower may deliver a second notice to Lender, together with a second copy of the Budget Approval Information, stating in bold uppercase letters: "PURSUANT TO THE TERMS OF SECTION 6.3.5 OF THE LOAN AGREEMENT EXECUTED BY GC SHL, LLC, AS BORROWER, DATED OCTOBER 27, 2017, LENDER HAS FAILED TO RESPOND TO THE REQUEST FOR APPROVAL. FAILURE OF LENDER TO RESPOND TO BORROWER'S REQUEST FOR SUCH APPROVAL WITHIN 3 BUSINESS DAYS OF RECEIPT OF THIS SECOND NOTICE SHALL BE DEEMED TO BE LENDER'S APPROVAL OF SUCH MATTER".  If Lender fails to approve or disapprove (which such disapproval shall include reasons) of such matter within such additional three (3) Business Day period, such matter shall be deemed approved by Lender.  Lender acknowledges that to the extent of a dispute over the Annual Budget, Borrower and Lender will be bound by the dispute resolution mechanism set forth in the Management Agreement.

       **6.3.6**   **Breach.**  If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "*Required Records*") required by this Section 6.3 within the later of (i) thirty (30) days after the date upon which such Required Record is due or (ii) promptly upon receipt from Manager, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure.  In addition, thirty (30) days after Borrower's failure to timely deliver any Required Records pursuant to the immediately preceding sentence, Lender shall have the option, upon fifteen (15) days notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

       **6.3.7**   **Hotel Accounting.**  All monthly and other operating statements to be delivered by Borrower hereunder shall be (and all accompanying Borrower's Certificates shall state that they have been) prepared in accordance with GAAP or based upon the Uniform System of Accounts for Hotels, current edition..

       **6.3.8**   **Form of Reports.**  Lender hereby confirms it has approved the forms of reports delivered by Manager and any such reports shall be in form and content sufficient to satisfying the deliveries required under Section 6.3.2 and Section 6.3.3.

## 7.     INSURANCE; CASUALTY; AND CONDEMNATION

    **7.1**   **Insurance.**

       **7.1.1**   **Coverage.**  Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

         (a)     Property insurance insuring against loss or damage customarily included under so

called "all risk" or "special form" policies including fire, lightning, flood (if applicable), earthquake (if applicable), windstorm/hail, vandalism, and malicious mischief, boiler and machinery and coverage for damage or destruction caused by the acts of terrorists, both foreign and domestic, whether considered "certified" under applicable laws and legislation or otherwise (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction.  Such insurance policy shall also provide coverage for Ordinance or Law, coverage for loss to the Improvements, demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub–limit satisfactory to Lender).  Each such insurance policy shall (i) be in an amount equal to the greater of (A) one hundred percent (100%) of the then replacement cost of the Improvements without deduction for physical depreciation, and (B) such amount as is necessary so that the insurer would not deem Borrower a co–insurer under such policies, (ii) have deductibles no greater than $25,000 per occurrence, (iii) be paid annually in advance, (iv) contain either no coinsurance or, if coinsurance, an agreed amount endorsement, and (v) contain a replacement cost endorsement with a waiver of depreciation, and shall cover, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to any Lease on a replacement cost basis.  If the insurance required under this subsection is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost to the Improvements and such Tenant improvements in an amount to be subject to the consent of Lender, which consent shall not be unreasonably withheld, but in all events, not less than would be required to restore the Property following a Casualty.  If policy is written as part of a blanket, Borrower will provide Lender with a complete schedule of locations and values for properties associated with the blanket policy for the New York metropolitan area and will notify the Lender before any other locations in the New York Metropolitan Area are added to the blanket policy.  Notwithstanding the foregoing, the Borrower may add properties to Borrower's master property insurance policy without limitation and without notice to Lender, provided however, that with respect only to properties located in the New York metropolitan area, (i) the aggregate total insurable value for all New York metropolitan area -located properties including The Standard does not exceed $900,000,000, and (ii) upon written request by Lender, Borrower will provide within ten business days the respective statement of values for such New York metropolitan area-located properties. Further, the borrower shall continue to maintain their current blanket limits of coverage  Lender shall be named Mortgagee and Lender's Loss Payable on a Standard Mortgagee Endorsement.

(b)    Flood insurance if any part of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, in an amount at least equal to the lesser of: (i) the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation and (B) the unpaid Principal and (ii) the maximum limit of coverage available under the National Flood Insurance Plan with respect to the Property; provided, however, that Lender shall be entitled to require flood insurance in amounts greater than the foregoing, in its discretion. If flood insurance is required, the maximum deductible allowable on the primary layer of coverage shall be $10,000.

(c)    Public liability insurance, including terrorism, to be written on an occurrence basis with no deductible or self–insured retention unless otherwise approved by Lender in advance and in writing, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability"; and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage and including "Dram Shop" or other liquor liability coverage if alcoholic beverages are sold from or may be consumed at the Property and including garagekeeper's legal liability at any time valet parking is provided at the property, such insurance providing in combination not less than $1,000,000 per occurrence, not less than $2,000,000 in the annual aggregate and not less than $50,000,000.00 umbrella, each on a per location basis.  If aggregate limits are shared with other locations

the coverage shall include either (A) a "Per Location Aggregate Endorsement" or (B) the amount of umbrella liability insurance to be provided shall be not less than $50,000,000 in excess of the umbrella coverage set forth in the preceding sentence. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage.

(d)     Rental loss or business interruption insurance including terrorism (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to one hundred percent (100%) of the projected Rents from the Property during the period of restoration but not less than eighteen (18) months; and (iii) containing an extended period of indemnity endorsement of not less than six (6) months which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is damaged, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such insurance shall be increased from time to time during the Term as and when the estimated or actual Rents increase.

(e)     To the extent such equipment exists on the Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to the lease on a replacement cost basis or such other amount as approved by Lender in its discretion.

(f)     If applicable, Worker's compensation insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of repair or restoration, builder's "all–risk" insurance on a "Completed Value Basis" in an amount equal to not less than the full, completed insurable value of the Property, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance and with deductibles acceptable to Lender, and consistent with the insurance requirements set forth in Section 7.1.1(a).

(h)     Such other insurance or higher limits on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required pursuant to the terms of the Management Agreement or by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, sinkhole, mine subsidence and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(i)     Lender's Environmental Collateral Protection insurance related to the Property issued by Steadfast Insurance Company (A Zurich Company) with an expiration date of not earlier than October 27, 2027 with a three (3) year tail with the Lender and its successors and assigns as the Named Insured (the "***Environmental Policy***").

7.1.2  **Policies.**  Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "*Policies*") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed and/or authorized to do business in the State, with a claims paying ability rating of "A-" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) name Lender and its successors or assigns as their interests may appear as the Mortgagee and Lender's Loss Payable (in the case of property, business personal property, and in the case of rent loss or business interruption insurance) and

an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non–Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the Person to which all payments made by such insurance company shall be paid; (iv) contain provisions permitting Borrower to waive its right of subrogation against Lender; (v) be assigned and the originals thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co–insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of any of the Property Policies (at least ten (10) days' prior written notice of cancellation due to nonpayment of premium), and when available, liability policies (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender), (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (D) providing that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non–payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.  Borrower shall pay the premiums for such Policies (the "***Insurance Premiums***") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to <u>Section 3.3</u>) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If Borrower does not furnish such evidence and receipts at least ten (10) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender certificates of insurance and copies of redacted policies of insurance for each such Policy within thirty (30) days after its effective date.  Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and the like.

> **7.2**     <u>**Casualty.**</u>

> > **7.2.1**     <u>**Notice; Restoration.**</u>  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***") and the casualty is in excess of $2,000,000, Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements and the Franchise Agreement to be of at least equal value and of substantially the same character as prior to such damage or destruction.

> > **7.2.2**     <u>**Settlement of Proceeds.**</u>  If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed $2,000,000, provided no Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").  In the event of an Insured

Casualty where the loss equals or exceeds $2,000,000 (a "***Significant Casualty***"), Lender may, in its sole discretion but following good faith consultation discussions with Borrower, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss.  All Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney–in–fact, coupled with an interest, to endorse such check payable to the order of Lender.  The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

      **7.3**    **Condemnation.**

          **7.3.1**    **Notice; Restoration.**  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

          **7.3.2**    **Collection of Award.**  Lender is hereby irrevocably appointed as Borrower's attorney–in–fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt.  Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.  Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

      **7.4**    **Application of Proceeds or Award.**

          **7.4.1**    **Application to Restoration.**  If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid balances of the Loan and any New Mezzanine Loan, (ii) in the reasonable judgment of Lender, the Property can be restored within the earliest to occur of (w) eighteen (18) months from the date of the Insured Casualty or Condemnation, (x) six (6) months before the Stated Maturity Date and (y) the expiration of the rental or business interruption insurance with respect thereto, and (z) the date required for such restoration pursuant to the terms of the Management Agreement, to the Property's pre–existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt, (iii) no Event of Default shall have occurred and be then continuing and (iv) the Management Agreement is not terminated as a result of

such Insured Casualty or Condemnation, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein.  Borrower shall commence and diligently prosecute such Restoration.  Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award to be made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service, as reasonably determined by Lender.

**7.4.2    Application to Debt.**  Except as provided in Section 7.4.1, any Proceeds or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3.  Any such prepayment of the Loan shall otherwise be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event, if such prepayment is occurring prior to the Open Prepayment Date, Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.  After any such application to the unpaid Principal, the remaining unpaid Principal shall be reamortized over the remaining Term hereof.

**7.4.3    Procedure for Application to Restoration.**  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications and construction contracts for such Restoration, such plans and specifications and construction contracts to be approved by Lender prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time (provided, however, Borrower shall be permitted to pay in full any subcontractors who have fully completed their work); funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Event of Default is then continuing, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.

7.4.4 **Prepayment upon Partial Condemnation.** Notwithstanding the foregoing provisions in this <u>Section 7</u>, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation Award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

## 8. <u>DEFAULTS</u>

**8.1 <u>Events of Default.</u>** An "*Event of Default*" shall exist with respect to the Loan if any of the following shall occur:

(a) any portion of the Debt is not paid when due or any other amount under <u>Section 3.10(a)</u> (but excluding amounts payable pursuant to clause (ix)) is not paid in full when due (unless sufficient funds are available in the relevant Subaccount on the applicable date);

(b) any of the Taxes are not paid prior to delinquency (unless Lender is paying such Taxes pursuant to <u>Section 3.3</u>), subject to Borrower's right to contest Taxes in accordance with <u>Section 5.2</u>;

(c) the Policies are not kept in full force and effect, or are not delivered to Lender (in each case unless Lender is paying the premiums for such Policies pursuant to <u>Section 3.3</u>) within ten (10) Business Days of Lender's request;

(d) a Transfer other than a Permitted Transfer occurs;

(e) any representation or warranty made in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made; provided, however, if such misrepresentation was unintentional and deemed by Lender to be immaterial, Borrower shall have thirty (30) days from Lender's demand to update such representation;

(f) Borrower, Borrower Representative or Guarantor shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(g) a receiver, liquidator or trustee shall be appointed for Borrower, Borrower Representative or Guarantor; or Borrower, Borrower Representative or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Borrower Representative or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Borrower Representative or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary

and not consented to by Borrower, Borrower Representative or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within one hundred twenty (120) days;

        (h)      any covenant contained in Sections 5.14 or 5.15 is breached;

        (i)      except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any of portion of the Improvements without the prior written consent of Lender where required under the Loan Documents or the physical waste of any portion of the Property;

        (j)      an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs;

        (k)      a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

        (l)      any of the assumptions contained in any substantive non–consolidation opinion, delivered to Lender by Borrower's counsel in connection with the Loan or otherwise hereunder, were not true and correct as of the date of such opinion or thereafter became untrue or incorrect;

        (m)      a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non–monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)–day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)–day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)–day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days;

        (n)      Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9; provided however Borrower shall have a ten (10) cure period from receipt of written demand from Lender for the first breach only.

        (o)      Borrower voluntarily terminates or cancels the Management Agreement without Lender's prior written consent or enters in any Replacement Franchise Agreement without Lender's prior written consent, if required according to the terms and conditions of the Loan Documents or operates the Property under the name of any hotel chain or system other than "Standard" without Lender's prior written consent, if required according to the terms and conditions of the Loan Documents ;

        (p)      either (1) the termination of the Management Agreement by Manager prior to the expiration date of the Management Agreement, or (2) the expiration of the term of the Management Agreement prior to the Maturity Date, and, in either such event either (A) Borrower fails to renew the term of the Management Agreement or replace such Management Agreement within sixty (60) days following such termination or expiration with a Replacement Management Agreement and, if applicable, a Replacement Franchise Agreement as required under Section 5.11 hereof and (B) Borrower fails to provide Lender with a comfort letter, tri-party agreement or other agreement among such Manager or replacement manager or franchisor (as applicable), Lender, and Borrower that contains terms reasonably

acceptable to Lender or to pay any cost or fees associated with such comfort letter, tri party agreement, other agreement or replacement of any of the foregoing agreements;

(q)     Borrower's failure to pay any transfer or assignment fees required under or in connection with the Management Agreement and/or Manager Subordination Agreement;

(r)     if Borrower ceases to continuously operate the Property or any material portion thereof as a hotel for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken pursuant to the Management Agreement); or

(s)     if any liquor license relating to the Property ceases to be in full force and effect, and such liquor license is not restored, revived or otherwise replaced within sixty (60) days, except with Lender's prior written consent.

**8.2**    **Remedies.**

**8.2.1**    **Acceleration.**  Upon the occurrence of an Event of Default (other than an Event of Default described in subsection (f) or (g) of Section 8.1) and at any time and from time to time thereafter for so long as such Event of Default continues, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in subsection  (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2**    **Remedies Cumulative.**  Upon the occurrence of an Event of Default, for as long as such Event of Default continues, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

**8.2.3    Severance.**  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies; provided, however, no such severance, bifurcation or modification shall alter the economic terms of the Loan Documents or otherwise modify in any non-ministerial fashion Borrower's rights, obligations, recourse or duties thereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**8.2.4    Delay.**  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, but expressly subject to <u>Section 10.1</u> hereof, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

**8.2.5    Lender's Right to Perform.**  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest from the date of demand at the Default Rate until paid. Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

**9.    SECONDARY MARKET PROVISIONS**

**9.1    Transfer of Loan.**

(a)    Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass–through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "*Securities*") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "*Secondary Market Transaction*").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "*Investor*") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, Borrower Representative and Guarantor and the Property, whether furnished by Borrower, Borrower Representative, Guarantor or otherwise, as Lender determines

necessary or appropriate.  Notwithstanding anything in this Agreement to the contrary, Lender may not sell, transfer or assign the Loan to any Person who is unable to provide a completed IRS Form W-9 or other applicable form certifying or otherwise establishing that payment to such Person is exempt from U.S. federal backup withholding tax.

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies or applicable Legal Requirements in connection with any Secondary Market Transactions, including to:

(i)    (A) to the extent available or under Borrower's control, provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Borrower Representative, Guarantor, any Affiliate of Borrower, Borrower Representative, Guarantor or Manager, (B) provide updated budgets relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the information referred to in clauses (A), (B) and (C) shall hereinafter be referred to collectively as "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information through letters of auditors, certificates of third party service providers or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)    provide updates of opinions of counsel delivered upon the closing of the Loan which may be relied upon by Lender and NRSROs, and their respective counsel, agents and representatives and  which counsel and opinions shall be satisfactory to Lender and the Rating Agencies;

(iii)    provide updated (as of the closing date of any Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as Lender or the Rating Agencies may reasonably require;

(iv)    subject to Section 9.4 hereof, execute modifications and amendments to the Loan Documents and Borrower's organizational documents as Lender or the Rating Agencies may require, including, without limitation, the addition of one or more Independent Managers pursuant to the terms and provisions of **Schedule 4** attached hereto;

(v)    provide access to, and conduct tours of, the Property; and

(vi)    provide certifications or other evidence of reliance acceptable to Lender and the Rating Agencies with respect to third party reports and other information obtained in connection with the origination of the Loan or any Updated Information.

(c)    If, at the time a Disclosure Document (as hereinafter defined) is being prepared for a Secondary Market Transaction, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including Guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and any Related Property collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following financial information:

(i)    if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, net operating income for

the Property and any Related Property for the most recent fiscal year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB); or

           (ii)       if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X (17 C.F.R. Part 210), and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

           (d)       Further, if requested by Lender, Borrower shall, promptly upon Lender's request, and subject to the terms and provisions of any Lease of the applicable Tenant of the Property, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any Tenant of the Property if, in connection with a Secondary Market Transaction, Lender expects there to be, as of the cutoff date for such Secondary Market Transaction, a concentration with respect to such Tenant or group of Affiliated Tenants within all of the mortgage loans included or expected to be included in the Secondary Market Transaction such that such Tenant or group of Affiliated Tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such Tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

           (e)       If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and any Related Property collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

           (f)       Any financial data or financial statements provided pursuant to this Section 9.1 shall be furnished to Lender within the following time periods:

           (i)       with respect to information requested in connection with the preparation of Disclosure Documents for a Secondary Market Transaction, within sixty (60) days after notice from Lender; and

(ii)    with respect to ongoing information required under Section 9.1(d) and (e) above, (A) not later than sixty (60) days after the end of each fiscal quarter of Borrower and (B) not later than one hundred twenty (120) days after the end of each fiscal year of Borrower.

(g)    If requested by Lender, Borrower shall provide Lender, promptly, and in any event within thirty (30) days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Secondary Market Transaction or as shall otherwise be reasonably requested by the Lender.

(h)    If requested by Lender, whether in connection with a Secondary Market Transaction or at any time thereafter during which the Loan and any Related Loans are included in a Secondary Market Transaction, the Borrower shall provide Lender, promptly upon request, a list of Tenants (including all affiliates of such Tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the Improvements or represent 20% or more of aggregate base.

(i)    All financial statements provided by Borrower pursuant to this Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP (as modified by the USALI) and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements.  All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

**9.2    Use of Information.**    Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "***Disclosure Document***") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "***Securities Act***"), or the Securities and Exchange Act of 1934, as amended (the "***Exchange Act***"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction. Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

**9.3    Borrower Indemnity.**

(a)    Borrower hereby agrees to indemnify Natixis, including its officers, directors, Affiliates and each Person who controls Natixis within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "***Natixis Group***"), the issuer of the Securities (the "***Issuer***" and for purposes of this <u>Section 9.3</u>, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "***Underwriter Group***") for any losses, claims, damages (excluding consequential,

punitive, special and exemplary damages) or liabilities (collectively, the "*Liabilities*") to which Natixis, the Natixis Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Natixis by Borrower and its agents, counsel and representatives ("*Provided Information*"), or (ii) the omission or alleged omission to state in any Provided Information a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not materially misleading. Borrower also agrees to reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities. Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with Provided Information. This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(b)      In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Natixis, the Natixis Group, the Issuer and the Underwriter Group for Liabilities to which Natixis, the Natixis Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, Provided Information, and (ii) reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(c)      Promptly after receipt by an indemnified party under this Section 9.3 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.3, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.3, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party. Without the prior written consent of Natixis (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit

or proceeding) unless the indemnifying party shall have given Natixis reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

        (d)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.3(a) or (b) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.3(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted;  (ii) the opportunity to correct and prevent any statement or omission; and  (iii) any other equitable considerations appropriate in the circumstances.  Natixis and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

        (e)    The liabilities and obligations of both Borrower and Natixis under this Section 9.3 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.  Notwithstanding anything to the contrary herein contained, Borrower shall have no liability under Sections 9.3(b) or (c) to the extent of any liability arising thereunder if such liability arose solely as the result of an indemnified party's gross negligence, willful misconduct, bad faith, fraud or illegal acts.

        **9.4**    **Restructuring of Loan.**  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into multiple notes (which may include component notes or senior and junior notes) or to create participation interests in the Loan, and which restructuring may include reallocation of principal amounts of the Loan (including, by way of example, the increase or decrease in the principal amount of the senior note and instrument securing same, and the corresponding decrease or increase in the principal amounts of the junior note(s) and the security instrument(s) securing same) or the restructuring of a portion of the Loan into a mezzanine loan (the "*New Mezzanine Loan*") to the owners of the direct equity interests in Borrower, secured by a pledge of such direct equity interests, the establishment of different interest rates and debt service payments for the Loan and the New Mezzanine Loan and the payment of the Loan and the New Mezzanine Loan in such order of priority as may be designated by Lender; provided, that (i) the total amounts of the Loan and the New Mezzanine Loan shall equal the amount of the Loan immediately prior to the restructuring, (ii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the interest rate which was applicable to the Loan immediately prior to the restructuring, (iii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the debt service payments on the Loan and the New Mezzanine Loan shall equal the debt service payment which was due under the Loan immediately prior to the restructuring and (iv) the New Mezzanine Loan Documents shall be on a form substantially similar to the Loan Documents and any such changes from the Loan Documents shall have no economic effect, other than a de minimis effect, on any of Borrower's obligations, rights or remedies hereunder; provided that Lender and Borrower shall bear their own costs and expenses incurred with respect to any such restructuring carried out after the closing of the Loan.  Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Loan and create the New Mezzanine Loan and shall (A) execute and deliver such documents including, in the case of the New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement ("*New

***Mezzanine Loan Documents***"), (B) cause Borrower's counsel to deliver such legal opinions in substantially the same form as the opinions delivered on the date hereof and (C) create such newly formed bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (A), (B) and (C) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Instrument and other Loan Documents if requested.  In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this <u>Section 9</u> after the expiration of ten (10) Business Days after notice thereof.  Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representations and warranties set forth in <u>Section 4.1</u> and <u>Section 5.12</u> hereof.

## 10.    <u>MISCELLANEOUS</u>

**10.1    <u>Exculpation</u>.**  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this <u>Section 10.1</u> shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Security Instrument or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)    fraud or intentional misrepresentation by Borrower or any Guarantor in connection with the Loan;

(b)    the gross negligence or willful misconduct of Borrower;

(c)    the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including <u>Sections 4.19</u> and <u>5.7</u>, and clauses (viii) through (xi) of <u>Section 5.18</u>;

(d)    (i) intentional physical waste by Borrower, Guarantor, Manager or any Affiliate of any of the foregoing, except to the extent (A) Borrower has deposited required funds into one or more Subaccounts established under the Loan Documents for the repair, replacement and maintenance of the Property and such waste is a result of Lender's failure to release such reserved funds to Borrower to allow Borrower to prevent such waste (and Borrower has satisfied the requirements under the Loan Documents, other than any condition that no Event of Default than exists, for the disbursement of such reserved funds from the applicable Subaccount), or (B) such waste is due to the failure of the Property to generate sufficient Rents to prevent such waste, or (ii) after an Event of Default, the removal or disposal of any portion of the Property (other than to the extent such personal property is obsolete replacement or such personal property with equivalent or superior property not in violation of the Loan Documents);

(e)    the misapplication or conversion by Borrower of (x) any Proceeds paid by reason of any Insured Casualty, (y) any Award received in connection with a Condemnation, and (z) any Rents, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents), in each case in violation of the Loan Documents;

(f)    failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof and except to the extent that cash flow from the Property is insufficient to pay for such charges and the resulting Liens (1) are subordinate to the lien of the mortgage, (2) arose for failure to pay charges for labor or materials, and (3) at the time such charges were incurred, the Borrower reasonably believed that cash flow from the Property would be sufficient to pay for such charges;

(g)    any security deposits for retail Leases collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Security Instrument or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)    an act or omission of any of Borrower, Borrower Representative or Guarantor undertaken in bad faith with the intent of hindering, delaying or interfering with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, Borrower Representative or Guarantor of defenses or counterclaims in bad faith with the intent of hindering, delaying or interfering with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral (unless such defenses or counterclaims are (a) asserted in good faith and (b) not frivolous);

(i)    Borrower's indemnifications of Lender set forth in Section 9.3;

(j)    a breach of the special purpose entity covenants that is not a Consolidation SPE Breach;

(k)    Borrower's failure to maintain, or failure to cause Manager to maintain, all insurance coverages required under the Management Agreement (as defined below), except to the extent (x) income from the Property is not sufficient to pay Insurance Premiums or (y) sufficient funds for the payment of Insurance Premiums are not disbursed to Borrower pursuant to Section 3.10(a)(i) of the Loan Agreement for the payment of Insurance Premiums;

(l)      all amounts paid by Lender in connection with any transfer or assignment fees payable under or in connection with the Management Agreement and/or Management Subordination Agreement;

(m)      either (1) the termination of the Management Agreement by the Manager prior to the expiration date of the Management Agreement in violation of the Loan Documents, or (2) the expiration of the term of the Management Agreement prior to the Maturity Date in violation of the Loan Documents, and, in either such event, Borrower fails to renew the term of the Management Agreement or replace such Management Agreement within ninety (90) days following such termination or expiration with a Replacement Management Agreement and, if applicable, a Replacement Franchise Agreement as required under Section 5.11 hereof.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "***Springing Recourse Event***"):

(i)      an Event of Default related to a non-permitted Transfer shall have occurred (other than mechanics' Liens, Liens arising from trade payables in the ordinary course of business and Liens for Taxes (for the purposes of clarification, the exclusion of mechanics' Liens, Liens arising from trade payables and Tax Liens from this clause (i) shall not vitiate any applicable partial recourse provisions set forth above, or the full recourse provisions of clause (ii) below); or

(ii)      a breach of the covenants contained in Section 5.12 which results in the assets and liabilities of Borrower being substantively consolidated with any other Person (a "Consolidation SPE Breach"), or

(iii)      Borrower, Borrower's Representative or Guarantor shall make an assignment for the benefit of creditors, or

(iv)      a bankruptcy, insolvency, dissolution or similar action is instituted against, or a receiver, liquidator or trustee is appointed for, Borrower, Borrower's Representative or Guarantor or Borrower, Borrower's Representative or Guarantor is bankrupt or insolvent and, with respect to such condition or event described in this clause (iv), either Borrower, Borrower's Representative, Guarantor or any Affiliate of Borrower, Borrower's Representative or Guarantor causes such event or condition to occur (by way of example, but not limitation, such person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event; or

(v)      the Management Agreement (or the right to operate the Property thereunder) is cancelled, surrendered or terminated by Borrower without Lender's prior written consent; (which Lender consent, in the event of a material default by Manager only, shall not be unreasonably withheld, conditioned or delayed; provided, however, it is agreed that Borrower shall not be deemed to have "cancelled, surrendered or terminated" the Management Agreement if Borrower is exercising its remedies (short of termination) and Manager, in response terminates or surrenders the Management Agreement or claims a right to do so).

**10.2    Brokers and Financial Advisors.**  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders who will not be paid from the proceeds of the Loan at closing.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.  Borrower, Borrower Representative, Key Principal and any sponsor of Borrower acknowledge and agree that Lender and any of Lender's agents or correspondents, reserve the right, in their sole and absolute discretion, to provide additional compensation to any broker, correspondent or originator of the Loan.

**10.3    Retention of Servicer.**  Lender reserves the right to retain the Servicer and any special servicer to act as its agent(s) hereunder with such powers as are specifically delegated to the Servicer and any special servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any fees and expenses of the Servicer and any reasonable third-party fees and expenses, including, without limitation, special servicing fees, work-out fees, liquidation fees and attorney's fees and disbursements and fees and expenses in connection with a prepayment, release of the Property, approvals under the Loan Documents requested by Borrower, assumption of Borrower's obligations or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.  Notwithstanding anything to the contrary contained herein, Borrower shall not be responsible for any set up fees or any other initial costs relating to or arising under the servicing agreement, and Borrower shall not be responsible for the payment of the regular monthly master servicing fee or trustee fee due to a Servicer under the servicing agreement or any fees or expenses required to be borne by, and not reimbursable to, Servicer.

**10.4    Survival.**  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5    Lender's Discretion.**  Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

**10.6    Governing Law.**

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE

OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5–1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT CT CORPORATION SYSTEM AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**10.7    Modification, Waiver in Writing.**  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**10.8    Trial by Jury.**    TO THE EXTENT PERMITTED BY APPLICABLE LAW,

BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS <u>SECTION 10.8</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9    <u>Headings/Exhibits.</u>** The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10    <u>Severability.</u>** Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11    <u>Preferences.</u>** Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender. This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12    <u>Waiver of Notice.</u>** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13    <u>Remedies of Borrower.</u>** If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14  Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15  Offsets, Counterclaims and Defenses.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16  Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing and use the same in its marketing efforts without Borrower's approval, and Borrower hereby consents thereto and to Lender's use of Borrower's name, the name and address of the Property, the amount of the Loan, and such other information, including but not limited to the reproduction, publication and distribution of photographs and other images, regarding the Property as were obtained or developed by or on behalf of Lender, or as were obtained, developed or provided by or on behalf of Borrower, its Affiliates, agents, counsel, representatives or brokers, including as may be available on any website or data site established or maintained by Borrower, its Affiliates, agents, representatives or brokers regarding the Property. Borrower represents and warrants to Lender that Borrower has sufficient rights in such information, including but not limited to such photographs and other images, to grant Lender and its Affiliates the above rights to use such information, and agrees to hold Lender and its Affiliates harmless from any claim resulting from the failure or alleged failure to maintain such rights.  Furthermore, Borrower agrees to cooperate with Lender in a reasonable manner in connection with the use of such other information as may be reasonably requested by Lender.

**10.17  No Usury.**  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder (for avoidance of doubt, without the obligation to pay any Yield Maintenance Premium).  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and

applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18  Conflict; Construction of Documents.** In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**10.19  No Third Party Beneficiaries.** The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20  Yield Maintenance Premium.** Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents that is not prepayable without the payment of the Yield Maintenance Premium prior to the Open Prepayment Date and (b) if payments of Principal are made to Lender prior to the regularly scheduled due dates for such payments prior to the Open Prepayment Date, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs. For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided in <u>Sections 2.3.2, 2.3.4, 7.4.2</u> and <u>10.17</u>, all prepayments, if any, will be accompanied by the Yield Maintenance Premium. Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale. Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this <u>Section 10.20</u>, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21  Assignment.** The Loan, the Note, the Loan Documents or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise. Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender. Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22  Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

GC SHL, LLC,
a Delaware limited liability company

By: _____
Name:    Valerie Yip
Title:     Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*[Signature Page to Loan Agreement]*

**LENDER**:

NATIXIS REAL ESTATE CAPITAL LLC,
a Delaware limited liability company

By: _____
Name: ___Andrew B. Levine____
Title: ___Managing Director____

By: _____
Name: ___Roni Kotel_____
Title: ___Vice President_____

[*Signature Page to Loan Agreement*]

**<u>Schedule 1</u>**

**Index of Other Definitions**

"*Act*" – Schedule 4
"*Annual Budget*" – 6.3.5
"*Applicable Taxes*" – 2.2.3
"*Award*" – 7.3.2
"*Bankruptcy Action*" – Schedule 4
"*Bankruptcy Code*" – Security Instrument
"*Bankruptcy Proceeding*" – 4.7
"*Borrower's Recourse Liabilities*" – 10.1
"*Buyer*" – 5.16
"*Capital Budget*" – 6.3.5
"*Cash Collateral Reserve Subaccount*" – 3.11
"*Cash Management Accounts*" – 3.9
"*Casualty*" – 7.2.1
"*Casualty/Condemnation Prepayment*" – 2.3.2
"*Casualty/Condemnation Subaccount*" – 3.7
"*Condemnation*" – 7.3.1
"*Disclosure Document*" – 9.2
"*Embargoed Person*" – 5.19(a)
"*Environmental Laws*" – 4.19
"*Equipment*" – Security Instrument
"*Exchange Act*" – 9.2
"*Exchange Act Filing*" – 9.1(c)
"*Event of Default*" – 8.1
"*FATF*" – 5.19(b)
"*FF&E Reserve Subaccount*" – 3.4
"*First Payment Date*" – 2.2.1
"*Future Permitted Mezzanine Debt*" – 2.6
"*Hazardous Substances*" – 4.19
"*Improvements*" – Security Instrument
"*Indemnified Liabilities*" – 5.18
"*Indemnified Party*" – 5.18
"*Independent Director*" – Schedule 4
"*Independent Manager*" – Schedule 4
"*Insurance Premiums*" – 7.1.2
"*Insured Casualty*" – 7.2.2
"*Investor*" – 9.1
"*Issuer*" – 9.3(a)
"*Late Payment Charge*" – 2.5.3
"*Lender's Consultant*" – 5.7.1
"*Liabilities*" – 9.3(a)
"*Licenses*" – 4.10
"*Loan*" – 2.1
"*Mezzanine Loan*" – 2.6
"*Mezzanine Loan Borrower*" – 2.6
"*Monthly Debt Service Subaccount*" – 3.10(a)
"*Natixis Group*" – 9.3(a)
"*New Mezzanine Loan*" – 9.4

"*Notice*" – 6.1
"*OFAC*" – 5.19(a)
"*Operating Budget*" – 6.3.5
"*Operating Expense Subaccount*" – 3.6
"*Policies*" – 7.1.2
"*Principal*" – 2.1
"*Proceeds*" – 7.2.2
"*Remedial Work*" – 5.7.2(c)
"*Rent Roll*" – 4.15
"*Required Records*" – 6.3.6
"*Required Repairs*" – 3.2.1
"*Required Repairs Subaccount*" – 3.2.2
"*Restoration*" – 7.4.1
"*Secondary Market Transaction*" – 9.1
"*Securities*" – 9.1
"*Securities Act*" – 9.2
"*Security Agreement*" – 2.3.3(a)(vii)
"*Security Deposit Account*" – 3.8
"*Security Deposit Subaccount*" – 3.8
"*Significant Casualty*" – 7.2.2
"*Single Member Bankruptcy Remote LLC*" – Schedule 4
"*Sole Member*" – Schedule 4
"*Special Member*" – Schedule 4
"*Special Purpose Entity*" – Schedule 4
"*Special Transfer*" – 5.16
"*Springing Recourse Event*" – 10.1
"*Subaccounts*" – 3.1
"*Successor Borrower*" – 2.3.3(b)
"*Successor Guarantor*" – 5.16(i)
"*Tax and Insurance Subaccount*" – 3.3
"*Underwriter Group*" – 9.3(a)
"*Updated Information*" – 9.1(b)(i)

**Schedule 2**

**Required Repairs**

| Required Repair | Amount |
|---|---|
| According to records on file with the New York City Department of Buildings (BIN Nos. 1089466 and 1012203), there are three open Department of Building (DOB) violations for the subject property. Two of the DOB violations were issued in 2017 for the boilers (failure to submit the annual boiler inspection reports in 2015). The remaining violation was issued for one of the elevators. Partner recommends administratively closing the violations. | $1,500.00 |
| Provided pipe wrap/scald protection at common area ADA restrooms | $937.50 |
| Provide signage on ADA restrooms | $1,000.00 |
| Add lowered peep-holes to ADA guestroom doors | $1,312.50 |
| Provide ADA communication kits. | $2,500.00 |
| TOTAL: | $7,250.00 |

**<u>Schedule 3</u>**

**Organization of Borrower**

CONFIDENTIAL

# Project Hudson - Proposed Ownership Structure



**Schedule 4**

**Definition of Special Purpose Entity**

A "***Special Purpose Entity***" means either (1) a limited liability company that is a Single Member Bankruptcy Remote LLC (as hereinafter defined) or (2) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

(i)      was and will be organized solely for the purpose of (A) acquiring, owning, holding, leasing, operating, managing, maintaining, developing and improving the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

(ii)     has not engaged and will not engage in any business unrelated to (A) the acquisition, ownership, holding, leasing, operating, managing, maintenance, development and improvement of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

(iii)    has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

(iv)     has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v)      if such entity is a limited partnership, has and will have, as its only general partner a Special Purpose Entity that is a corporation or limited liability company;

(vi)     if such entity is a corporation, has and will have at least two (2) Independent Directors, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors (including any Independent Directors) shall have participated in such vote;

(vii)    intentionally deleted;

(viii)   intentionally deleted;

(ix)     has not, and without the unanimous consent of all of its partners, directors or members (including any Independent Director or Independent Manager), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

(x)      has maintained and will intend to maintain adequate capital in light of its contemplated business operations, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower or restore any negative capital accounts;

(xi)    has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns separate from any other Person;

(xiii)    has maintained and will maintain its books, records, resolutions and agreements as official records separate from any other Person;

(xiv)    has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)    has held and will hold all of its assets solely in its own name;

(xvi)    has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)    has paid and will pay its own liabilities, including the salaries of its own employees, only out of its own funds and assets, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower or restore any negative capital accounts;

(xix)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)    has maintained and will maintain an arm's–length relationship with its Affiliates;

(xxi)    (a)    if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)    if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $50,000 and (2) are payable within thirty (30) days of when incurred, or

(c)    if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than (i) unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $50,000 and (2) are payable within thirty (30) days of when incurred and (ii) Future Permitted Mezzanine Debt;

provided, however, the foregoing clauses (a) through (c) shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower or restore any negative capital accounts;

(xxii)    except in connection with any Future Permitted Mezzanine Debt, has not and will not assume or guarantee or become obligated for the debts or obligations of any other Person or hold out its

credit or assets as being available to satisfy the debts or obligations of any other Person except for the Loan;

(xxiii)  has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)  has allocated and will allocate fairly and reasonably shared expenses, including shared office space, with its Affiliates and has used and will use and uses separate stationery, invoices and checks bearing its own name;

(xxv)  except in connection with the Loan or any Future Permitted Mezzanine Debt, has not pledged and will not pledge its assets or credit for the benefit of any other Person;

(xxvi)  has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii)  has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)  has not made and will not make loans to any Person;

(xxix)  has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)  has not entered into or been a party to, and will not enter into or be a party to, any transaction, contract or agreement with its partners, members, shareholders or Affiliates, or any partners, members, shareholders or Affiliates thereof, except in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and substantially similar to those of an arm's–length transaction with an unrelated third party;

(xxxi)  has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii)  has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations;

(xxxiii) has not and shall not list its assets as assets on the financial statement of any other Person, provided, however, the Borrower's assets may be included in a consolidated financial statement of its Affiliate provided that (A) appropriate notation shall be made on such consolidated financial statement to indicate the separateness of the Borrower from such Affiliate and to indicate that the Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person and (B) such assets shall also be listed on the Borrower's own separate balance sheet;

(xxxiv) has filed and shall file its own tax return separate from those of any other Person, except to the extent that the Borrower is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, and has paid and to the extent there is sufficient cash flow from the operation of the Property to do so, shall pay any taxes required to be paid under applicable law solely from its own funds;

(xxxv)  has not held out the assets or credit of any other and will not hold out the assets or credit of any other Person as being available to satisfy any of its debts or obligations;

(xxxvi) has not held itself out and will not hold itself out as having agreed to pay indebtedness of any other Person; and

(xxxvii) will consider its own interest, including the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

"*Independent Director*" means in the case of a corporation, a natural person who, for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

(i)    an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)    a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally–recognized company that provides professional independent directors),

(iii)    a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)    any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co–borrower with the corporation if such individual is an independent director provided by a nationally–recognized company that provides professional independent directors.

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a single purpose entity, (b) a single purpose entity  that is not a member or (c) a natural person who, for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

(i)    an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

(ii)    a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally–recognized company that provides professional independent managers),

(iii)    a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)    any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the

foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co–borrower with the limited liability company if such individual is an independent manager provided by a nationally–recognized company that provides professional independent managers.

**Schedule 5**

**Form of Credit Card Instruction Letter**

_____, 201__

_____
_____
_____

Re:     [_____] (the "**Company**")
        [property]

To Whom It May Concern::

        _____ (the "**Processor**") has entered into arrangements pursuant to which Processor acts as credit card processing service provider with respect to certain credit card and debit card sales by Company and makes payments to Company in respect of such sales as set forth in the [Merchant Services Bankcard Agreement], dated _____ between Processor and Company (and together with any replacement agreement thereto, referred to herein as the "**Card Processing Agreement**").

        Please be advised that Company has entered or is about to enter into financing arrangements with Natixis Real Estate Capital LLC (together with its successors and assigns, the "**Lender**") pursuant to which Lender may from time to time make loans and advances and provide other financial accommodations to Company, secured by, among other things, all of Company's right, title and interest in and to all deposit and other bank accounts and proceeds of the foregoing, including all amounts at any time payable by Processor to Company pursuant to the Card Processing Agreement or otherwise.

        Notwithstanding anything to the contrary contained in the Card Processing Agreement or any prior instructions to Processor, unless and until Processor receives written instructions from Lender to the contrary, effective as of the day after the date of Processor's written acknowledgement below all amounts payable by Processor to Company pursuant to the Card Processing Agreement or otherwise shall be sent by federal funds wire transfer or electronic depository transfer to the following bank account of Lender:

_____ (the "**Bank**")
ABA Number: _____
For the Account of:   Natixis Real Estate Capital LLC, as beneficiary of _____ their successors and assigns
Account Number: _____

        In the event Processor at any time receives any other instructions from Lender with respect to the disposition of amounts payable by or through Processor to Company pursuant to the Card Processing Agreement or otherwise, Processor is hereby irrevocably authorized and directed to follow such instructions, without inquiry as to Lender's right or authority to give such instructions. Company and Lender acknowledge that (a) any instructions from Lender to Processor to change the account to which funds must be sent by a vice president or other officer of Lender to Processor; (b) such instructions shall only provide for funds to be sent to a single deposit account of Lender, in a manner with respect to the nature of the funds transfer and at times consistent with the payment practices of Processor as then in effect, unless otherwise agreed by Processor.  The Company agrees to hold harmless Processor for any action taken by Processor in accordance with the terms of this letter and the Card Processing Agreement;

and Lender shall complete such account change forms as Processor may require.  The Company hereby acknowledges that the account set forth above is owned by Company but is under the control of Lender.

Processor and Company hereby confirm and agree as follows:  (i) the Card Processing Agreement is in full force and effect and (ii) this Payment Direction Letter does not prohibit or limit any rights Processor possesses under the Card Processing Agreement, including but not limited to Processor's right to debit, offset or charge back any amount owing to Processor under the Card Processing Agreement or any replacement or renewal thereof, against funds sent to or to be sent to the above referenced bank account.

This Payment Direction Letter cannot be changed, modified, or terminated, except by written agreement signed by Lender, Company and Processor.  Processor agrees to use reasonable efforts to ensure payment instructions are followed, but Lender and Company herein acknowledge that Processor shall incur no liability for changes or modifications wherein Processor has received instructions from Company or Lender to change deposit instructions.  The terms of this Payment Direction Letter shall be governed by the laws of the State of New York.

Please acknowledge your receipt of, and agreement to, the foregoing by signing in the space provided below.

Very truly yours,

_____,
a _____


By: _____
Name: _____
Title: _____


ACKNOWLEDGED AND AGREED:

[PROCESSOR]

By:_____
Name: _____
Title: _____

## Schedule 6

### UNCF Definition

UNCF will be calculated based on the property level revenues and expenses subject to certain adjustments by Lender, as follows:

1.    Room revenues will be based on a trailing 12-month performance. Lender may exclude non-recurring revenue within the historical period.

2.    Variable operating expenses (including both departmental and unapplied operating expenses) will be adjusted based on Lender' analysis of actual expense levels incurred over at least the last year and may be adjusted to reflect the industry standard percentage of revenues and/or adjustments based on the underwritten occupancy. Percentages will be calculated based on underwritten revenues.

3.    Other departmental revenues (food & beverage, telephone, etc.) will be adjusted to sustainable levels in accordance with the RevPar adjustment and shall be adjusted to exclude temporary or non-recurring items.

4.    Interest other non-recurring revenue, and non-recurring expenses will be excluded. Other non-operating revenue may be included to the extent Lender determines it is stabilized and recurring.

5.    Lender will underwrite franchise fees based on the actual fully vested fees charged at the Property and management fees based on the actual fully vested fees charged at the Property, including but not limited to base management fees. In making the foregoing adjustments, Lender shall have the right to adjust these fees if they are below market standards; provided, however, such franchise and management fees shall not exceed six percent (6%) of Gross Revenues in the aggregate.

6.    Fixed expenses including taxes and insurance, which will be underwritten at their stabilized and recurring levels.

7.    Amounts required to be contributed to the then appropriate FF&E Reserve based upon third-party reports and other due diligence, but in no event will the adjustment to net operating income be more than that required by the Management Agreement.

8.    Property level revenues will include any rents and reimbursements collected from retail tenants of the Property.

In making the foregoing adjustments, Lender shall apply such underwriting standards that are then being generally utilized by Lender with respect to loans on hotel properties which are similar to the Property.

**<u>Schedule 7</u>**

**Litigation**

**NONE**

**<u>Schedule 8</u>**

**[List of pre-approved Qualified Managers]**

    Journal Hotels

    GCP Hospitality

    Interstate Hotels and Resorts

## **Schedule 9**

### **[Façade Remediation Consultants]**

CANY - http://www.cany.com

Frank Seta

Gilsanz Murray Steficek

Heintges - http://www.heintges.com

Howard Zimmerman - http://www.hlzimmerman.com/fisp-local-law-11/

IBA

Simpson Gumpertz & Heger

Super Structures - http://www.superstructures.com

Vidaris - http://www.vidaris.com

**Schedule 10**

**Schedule of Deposits to Required  Repairs Reserve**

| Immediate Repair Cash Flow Sweep | |
| --- | --- |
| **Payment Date** | **Amount** |
| December 5, 2017 | $483.00 |
| January 5, 2018 | $483.00 |
| February 5, 2018 | $0.00 |
| March 5, 2018 | $0.00 |
| April 5, 2018 | $0.00 |
| May 5, 2018 | $483.00 |
| June 5, 2018 | $242.00 |
| July 5, 2018 | $242.00 |
| August 5, 2018 | $242.00 |
| September 5, 2018 | $242.00 |
| October 5, 2018 | $242.00 |
| November 5, 2018 | $242.00 |
| **Total:** | **$2,900.00** |

**Schedule 11**

**Schedule of Deposits to Façade Remediation Reserve**

| Roof & Façade Cash Flow Sweep | |
|---|---|
| **Payment Date** | **Amount** |
| December 5, 2017 | $231,158.00 |
| January 5, 2018 | $231,158.00 |
| February 5, 2018 | $0 |
| March 5, 2018 | $0 |
| April 5, 2018 | $0 |
| May 5, 2018 | $231,158.00 |
| June 5, 2018 | $115,579.00 |
| July 5, 2018 | $115,579.00 |
| August 5, 2018 | $115,579.00 |
| September 5, 2018 | $115,579.00 |
| October 5, 2018 | $115,579.00 |
| November 5, 2018 | $115,579.00 |
| **Total:** | **$1,386,950.00** |