UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee, on behalf of the registered holders of CSAIL 2017-CX10 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2017-CX10, and the holder(s) of the related Companion Notes, acting by and through its special servicer, CWCapital Asset Management LLC, | Index No. 1:21-cv-8940 |

Plaintiff,

v.

GC SHL, LLC; NEW YORK CITY
ENVIRONMENTAL CONTROL BOARD; NEW
YORK CITY DEPARTMENT OF FINANCE; and
JOHN DOES # 1 - 50, said John Doe defendants being
fictitious and unknown to Plaintiff, it being intended to
name all other parties who may have some interest in or
lien upon the premises sought to be foreclosed,

Defendants.

**ANSWER**

Defendant GC SHL, LLC (hereinafter "Borrower"), by its attorneys Rosenberg & Estis, P.C., as and for its Answer to Plaintiff's Complaint, dated November 1, 2021 ("Complaint"), alleges as follows:

1.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint.

2.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint, except admits that Borrower is a limited liability company organized under the laws of the State of Delaware, and respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

3.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 of the Complaint, and respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4 of the Complaint, and respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

## JURISDICTION AND VENUE

5.      The allegations contained in paragraph 5 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

6.      The allegations contained in paragraph 6 of the Complaint state a legal conclusion for which no response is required.

7.      The allegations contained in paragraph 7 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, specifically denies that Borrower is a citizen of PRC, and respectfully refers the Court to the referenced document and publicly available information for a full and complete recitation of the contents thereof.[1]

8.      Denies the allegations contained in paragraph 8 of the Complaint, and respectfully refers the Court to the referenced document and publicly available information for a full and

---

[1]      All capitalized terms not defined herein are ascribed their meaning in the Complaint.

- 2 -

complete recitation of the contents thereof, including, without limitation, the referenced Borrower's Certificate, dated as of October 27, 2017.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint.

10.     The allegations contained in paragraph 10 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

11.     The allegations contained in paragraph 11 of the Complaint state a legal conclusion for which no response is required, and Borrower respectfully refers the Court to any referenced documents and publicly available information for a full and complete recitation of the contents thereof.

## FACTS

### I.  The Loan and Related Loan Documents

12.     Admits that Borrower obtained a loan from Natixis Real Estate Capital LLC in the original principal amount of $170,000,000, and respectfully refers the Court to the document referenced therein a for a full recitation of the terms, commitments, and expectations of the parties' agreement.

13.     Denies the allegations contained in paragraph 13 of the Complaint, except admit that Borrower obtained a Consolidated, Amended and Restated Promissory Note, dated as of October 27, 2017, in the original principal amount of $170,000,000 (the "Original Note"), and respectfully refers the Court to the documents referenced therein, including without limitation, the Original Note for a full recitation of the terms, commitments, and expectations of the parties'

- 3 -

agreement.

14.     No response is required with respect to the allegations contained in paragraph 14 of the Complaint, and Borrower respectfully refers the Court to Exhibit 1 for a full and complete recitation of the contents thereof.

15.     Denies the allegations contained in paragraph 15 of the Complaint, except admit that Borrower obtained a Consolidated, Amended and Restated Mortgage, dated as of October 27, 2017 in the original principal amount of $170,000,000 (the "Mortgage"), and respectfully refers the Court to the documents referenced therein, including without limitation, the Original Note and Mortgage for a full recitation of the terms, commitments, and expectations of the parties' agreement.

16.     No response is required with respect to the allegations contained in paragraph 16 of the Complaint, and Borrower respectfully refers the Court to Exhibit 2 for a full and complete recitation of the contents thereof.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint, and respectfully refers the Court to referenced document for a full and complete recitation of the contents thereof.

18.     Admits the allegations contained in paragraph 18 of the Complaint.

19.     Denies the allegations contained in paragraph 19 of the Complaint, except admits that Borrower entered into an Assignment of Leases and Rents, dated as of October 27, 2017 (the "ALR"), and respectfully refers the Court to the documents referenced therein, including without limitation, the Original Note, Mortgage and ALR for a full recitation of the terms, commitments, and expectations of the parties' agreement.

- 4 -

20.     No response is required with respect to the allegations contained in paragraph 20 of the Complaint, and Borrower respectfully refers the Court to Exhibit 3 for a full and complete recitation of the contents thereof.

21.     Admits the allegations contained in paragraph 21 of the Complaint.

22.     Denies the allegations contained in paragraph 22 of the Complaint, except admits that Borrower entered into a Loan Agreement, dated as of October 27, 2017 (the "Loan Agreement"), and respectfully refers the Court to the documents referenced therein, including without limitation, the Original Note, Mortgage, ALR and Loan Agreement, for a full recitation of the terms, commitments, and expectations of the parties' agreement.

23.      No response is required with respect to the allegations contained in paragraph 23 of the Complaint, and Borrower respectfully refers the Court to Exhibit 4 for a full and complete recitation of the contents thereof.

24.     No response is required with respect to the allegations contained in paragraph 24 of the Complaint, and Borrower respectfully refers the Court to the Notes and the Note Splitter Agreement referenced in paragraph 24 of the Complaint for a full recitation of the terms, commitments, and expectations of the parties' agreement.

25.     Denies the allegations contained in paragraph 25 of the Complaint, and respectfully refers the Court to the documents referenced therein, including without limitation, the Notes, for a full recitation of the terms, commitments, and expectations of the parties' agreement.

26.     Denies the allegations contained in paragraph 26 of the Complaint, and respectfully refers the Court to the Notes and Loan Agreement for a full recitation of the terms, commitments, and expectations of the parties' agreement.

27.     No response is required with respect to the allegations contained in paragraph 27 of the Complaint, and Borrower respectfully refers the Court to Exhibit 5 for a full and complete recitation of the contents thereof.

28.     Admits the allegations contained in paragraph 28 of the Complaint.

**Transfer of the Loan to Plaintiff**

29.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Complaint.

30.     Denies the allegations contained in paragraph 30 of the Complaint.

31.     Denies the allegations contained in paragraph 31 of the Complaint, and respectfully refers the Court to Exhibit 6 for a full and complete recitation of the contents thereof.

32.     Denies the allegations contained in paragraph 32 of the Complaint, and respectfully refers the Court to Exhibit 7 for a full and complete recitation of the contents thereof.

33.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Complaint, and respectfully refers the Court to the Assignment of Mortgage, dated as of November 30, 2017, for a full and complete recitation of the contents thereof.

34.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Complaint.

35.     No response is required with respect to the allegations contained in paragraph 35 of the Complaint, and Borrower respectfully refers the Court to Exhibit 8 for a full and complete recitation of the contents thereof.

RE\31823\0001\4190375v9

36.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Complaint, and respectfully refers the Court to the ALR Assignment for a full and complete recitation of the contents thereof.

37.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of the Complaint.

38.     No response is required with respect to the allegations contained in paragraph 38 of the Complaint, and Borrower respectfully refers the Court to Exhibit 9 for a full and complete recitation of the contents thereof.

39.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Complaint, and respectfully refers the Court to the General Assignment for a full and complete recitation of the contents thereof.

40.     No response is required with respect to the allegations contained in paragraph 40 of the Complaint, and Borrower respectfully refers the Court to Exhibit 10 for a full and complete recitation of the contents thereof.

41.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of the Complaint, and respectfully refers the Court to the Co-Lender Agreement for a full and complete recitation of the contents thereof.

42.     Denies the allegations contained in paragraph 42 of the Complaint, and respectfully refers the Court to the Co-Lender Agreement for a full and complete recitation of the contents thereof.

43.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 of the Complaint.

- 7 -

44.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44 of the Complaint, except admits that CWCapital Asset Management LLC is the current Special Servicer of the Loan.

**The Payment Defaults**

45.     The allegations contained in paragraph 45 of the Complaint state a legal conclusion for which no response is required, and Borrower respectfully refers the Court to the Loan Agreement for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

46.     Denies the allegations contained in paragraph 46 of the Complaint, and respectfully refers the Court to relevant documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

47.     The allegations contained in paragraph 47 state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to the Loan Agreement and Loan Documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

48.     The allegations contained in paragraph 48 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to the Loan Agreement and Loan Documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

49.     Borrower respectfully refers the Court to the June 25, 2020 letter referenced in paragraph 49 of the Complaint for a full and complete recitation of the contents thereof.

RE\31823\0001\4190375v9

50.     No response is required with respect to the allegations contained in paragraph 50 of the Complaint, and Borrower respectfully refers the Court to Exhibit 11 referenced therein for a full and complete recitation of the contents thereof.

51.     The allegations contained in paragraph 51 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to the Mortgage and Loan Documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

52.     The allegations contained in paragraph 52 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to the Loan Agreement and Loan Documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

53.     No response is required with respect to the allegations contained in paragraph 53 of the Complaint, and Borrower respectfully refers the Court to Exhibit 12 referenced therein for a full and complete recitation of the contents thereof.

54.     Denies the allegations contained in paragraph 54 of the Complaint.

55.     The allegations contained in paragraph 55 of the Complaint state a legal conclusion for which no response is required.  To the extent a response is required, Borrower denies each allegation, and respectfully refers the Court to the Loan Agreement and Loan Documents for any conclusions of fact or law and for a full recitation of the terms, commitments, and expectations of the parties' agreement.

RE\31823\0001\4190375v9

## FIRST CAUSE OF ACTION
### (Foreclosure of the Mortgage)

56.     In response to paragraph 56 of the Complaint, Borrower repeats and realleges its responses to the allegations repeated and re-alleged in paragraphs 1 through 55 as if fully set forth herein.

57.     Denies the allegations contained in paragraph 57 of the Complaint, and respectfully refers the Court to the Loan Agreement, Mortgage and Loan Documents for a full recitation of the terms, commitments, and expectations of the parties' agreement.

58.     Denies the allegations contained in paragraph 58 of the Complaint.

59.     Denies the allegations contained in paragraph 59 of the Complaint.

60.     Denies the allegations contained in paragraph 60 of the Complaint.

61.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 of the Complaint.

62.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 of the Complaint.

63.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63 of the Complaint.

64.     The allegations contained paragraph 64 of the Complaint state a legal conclusion for which no response is required.

65.     Borrower denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint.

66.     Denies the allegations contained in paragraph 66 of the Complaint, and to the extent that paragraph 66 seeks to state any allegations or claims for relief, Borrower denies all such allegations and claims.

67.     The allegations contained in paragraph 67 of the Complaint state a legal conclusion for which no response is required.

68.     To the extent that any response may be deemed necessary to the allegations and prayers for relief set forth in the "WHEREFORE" clause, Borrower denies any and all allegations and requests for relief therein, including, but not limited to, those set forth in sub-paragraphs (a) - (d) of the of the "WHEREFORE" clause.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

69.     Plaintiff's claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

70.     Plaintiff's claims are barred, in whole or in part, by documentary evidence.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

71.     Plaintiff's claims are barred, in whole or in part, for lack of jurisdiction, including but not limited to personal jurisdiction.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

72.     Plaintiff lacks standing as it has failed to allege that it is the holder of the note that it seeks to enforce herein, since it is not the originating lender, and has failed to allege that the Note and Mortgage were assigned, transferred and/or physically delivered to it.  Plaintiff further lacks standing as it has failed to allege that the allonges were "firmly affixed" to the Notes.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

73.     Plaintiff's claims are barred, in whole or in part, by the doctrines of bad faith, unclean hands, and/or *in pari delicto*.

RE\31823\0001\4190375v9

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

74.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to mitigate its damages.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

75.     Any purported recovery under the Mortgage of default interest and fees is barred as such amounts violate the applicable usury statutes and public policy.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

76.     Plaintiff breached the covenant of implied good faith and fair dealing and is thus estopped from enforcing its purported agreement with Borrower.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

77.     Plaintiff's claims are barred and/or should be reduced to the extent they seek interest and/or default interest fees and penalties on the principal balance of the mortgage due to Plaintiff's wrongful, inequitable, and unconscionable conduct.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

78.     Plaintiff's claims are barred or should be reduced based on its negligent and culpable conduct.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

79.     Plaintiff's claims are barred, in whole or in part, under section 487 of the Judiciary Law by the doctrine of champerty.

80.     As alleged below, upon information and belief, in June 2021, Apollo Global Management Inc. ("Apollo") and Triangle Capital Group, LLC ("Triangle") acquired a small portion of the debt (18%) but purchased the control note and were installed as controlling bondholders.

- 12 -

81.     This acquisition occurred after the alleged default in May 2020.

82.     Apollo and Triangle purchased the B-B Notes with the intent and for the improper purpose of commencing litigation against Borrower.

83.     Apollo and Triangle's purpose in purchasing the B-B Notes was clear at the outset, when in June 2021 -- prior to finalizing a purported tri-party negotiation agreement among the parties and after Borrower and CWCapital were in prolonged negotiations and were virtually at the finish line in finalizing an agreement to modify the Loan -- it sent a notice of default and acceleration of the Loan to Borrower.

84.     Apollo and Triangle's conduct continued with a "take it or leave it" attitude and the proposal of outrageous and unconscionable terms that they knew would never be accepted by any borrower and then, shortly thereafter, the commencement of the instant foreclosure action.

85.     Accordingly, this action is barred by the doctrine of champerty.

## COUNTERCLAIM

Borrower, by its attorneys, Rosenberg & Estis, P.C., assert the following counterclaims against Plaintiff:

## PRELIMINARY STATEMENT

1.     Borrower's counterclaims arise from an illicit scheme to improperly usurp monies from Borrower with the ultimate goal of foreclosing on the Property and acquiring the asset -- an iconic luxury hotel straddling the Chelsea Highline (the "Hotel") -- through its deliberate bad faith efforts in violation of the terms of the Loan Documents.

2.     First, in October 2019, prior to the alleged default, approximately $1.1 million was on deposit in certain reserve accounts. Despite repeated requests, including providing the required

- 13 -

documentation for the disbursement of such funds, Plaintiff delayed and improperly refused to release such funds to Borrower.

3.      Plaintiff unnecessarily delayed in releasing these funds. If the funds were released upon the repeated urgent requests made by Borrower while the Hotel was closed due to the COVID-19 pandemic, the funds could have been applied towards interest payment and not led to an event of default in May 2020. In so doing, Plaintiff, among other things, improperly put Borrower in a worse position (i.e. defaulted borrower) and violated the implied duty of good faith and fair dealing.

4.      Further, after the alleged default and throughout 2020 and 2021, Borrower continued to request the release of these funds, but Plaintiff then conveniently cited the alleged default as a purported justification for its refusal to release such funds.

5.      Second, for over one year from April 2020 to June 2021, Borrower and Plaintiff, by its Special Servicer, CWCapital Asset Management LLC ("CWCapital"), engaged in negotiations based on Borrower's request for forbearance and a modification of certain loan terms, which were necessary for the continued operation of the Hotel due to the catastrophic impact caused by the COVID-19 pandemic on the hotel and tourism industry in New York City.

6.      During this time period, CWCapital presented a proposed term sheet and based on discussions Borrower had reasonable belief that an agreement could be reached that would be consistent with workouts for similarly situated hotel borrowers.

7.      However, the then current proposal was rejected, and in June 2021, Borrower was first advised that new controlling bondholders were now involved and would be leading any further negotiations relating to the Loan.

- 14 -

8.     Upon information and belief, upon their arrival, and prior to the execution of a tri-party negotiation agreement, Apollo and Triangle directed the issuance of a notice accelerating the Loan.

9.     Almost two months later, in August 2021, Apollo provided a new proposed term sheet, which contained unconscionable terms that violated industry standards in use by similarly situated lenders during the pandemic.

10.     Upon information and belief, Apollo and Triangle knew that Borrower could not, and would not, accept the outrageous new terms, but offered the terms to ensure that a resolution would never be reached, in an effort to extort millions from Borrower and ultimately the forced taking of the Hotel under the guise of an exercise of their remedies under the Loan Documents.

11.     In September 2021, Borrower submitted a counter-proposal which included bringing all unpaid accrued interest current immediately,  payment of all fees, modification fee, and partial default interest.  But, despite Borrower's continued efforts to bring the Loan current, Apollo and Triangle did not respond and simply stated that they planned to foreclose on the Property.

12.     Following through with their devious plan, Plaintiff refused to engage in any further negotiations and commenced the instant foreclosure action in November 2021.

## FACTS

### I.     The Standard High Line Hotel

13.     In 2017, Borrower purchased the Hotel -- an iconic luxury hotel straddling the Chelsea High Line -- for $340 million.

14.     The Hotel has 338 guestrooms, each featuring a full wall of floor-to-ceiling windows with views of Manhattan and/or the Hudson River. The hotel has five food and beverage

- 15 -

outlets, including a German beer garden at ground level, the rooftop club Le Bain, the Top of The Standard, the Standard Grill and an outdoor public plaza.

15.     Since 2017, Borrower has invested over $196 million in equity resulting in significant value.  As a result, Plaintiff's Loan is overcollateralized and there is no threat, imminent or otherwise to the repayment of the Loan.

## II.   The COVID-19 Pandemic
##       And Its Impact On the Hotel

16.     The COVID-19 pandemic began bearing down on the New York City Metropolitan Area in mid-March 2020.  Few areas of the economy, if any, were impacted as greatly as the hospitality industry, especially in New York, where the Hotel is located.

17.     On March 16, 2020, as the crisis worsened, New York City Mayor Bill de Blasio issued Emergency Executive Order No. 100, requiring the Hotel to close its restaurants and bars -- which make up a core component of the Hotel's revenue stream --"until further notice."

18.     On March 18, 2020, Governor Cuomo issued Executive Order 202.6, requiring nonessential businesses to reduce their in-person workforce by 50%.  By this time, business and commerce in New York City was already at a virtual standstill.

19.     Subsequently, Executive Order 202.8, issued on March 20, 2020, ordered all nonessential businesses and nonprofit organizations to "reduce [their] in-person workforce . . . by 100% no later than March 22, [2020] at 8 p.m."

20.     Pursuant to the Governor's Executive Order 202.8, and for the safety of its employees and guests, on March 22, 2020 the Hotel officially closed.

RE\31823\0001\4190375v9

### III.   Plaintiff Improperly Refuses to Release
####       <u>Funds Available in the Façade Subaccount</u>

21.     Section 3.12 of the Loan Agreement required Borrower to maintain significant funds on deposit (the "Façade Subaccount") in order to facilitate certain façade work to be performed on the Hotel.  Upon completion of the façade work, Loan Agreement Section 3.12(b) provides, in pertinent part, that:

> Upon written confirmation from the preparer of the Façade Report (or, at [Plaintiff's] election, [Plaintiff's] consultant, such confirmation not to be unreasonably withheld) that all Façade Remediation has been completed as required in the Façade Report, amounts remaining on deposit in the Façade Subaccount shall be deposited to the Clearing Account.

22.     Section 3.1 of the Loan Agreement provides, in pertinent part, that "[funds] deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and disbursed in accordance with this Agreement."

23.     Section 3.10a(iii) of the Loan Agreement states, in pertinent part, that amounts deposited in the Deposit Account shall be furnished "to [Plaintiff] to pay the Monthly Debt Service Payment Amount Due on such Payment Date . . . ."

24.     Accordingly, any monies disbursed from the Façade Subaccount to the Clearing Account were to be swept into the Deposit Account and utilized to satisfy Borrower's Monthly Debt Service Payments.

25.     In August 2019, Borrower first advised KeyBank Real Estate Capital ("Keybank") that after the completion of façade repairs significant funds would remain in the Façade Subaccount.

- 17 -

26.     On October 22, 2019, Borrower provided to Keybank a Façade Report pursuant to section 3.12(b) of the Loan Agreement, and requested that the amounts remaining on deposit in the Façade Subaccount -- nearly $1.1 million -- be released.

27.     However, as of early March 2020, Keybank still did not release the funds.

28.     Realizing that the COVID-19 pandemic would likely present a historic challenge, on March 18, 2020, Borrower urgently contacted Keybank to again request that the available funds in the Façade Subaccount be released.  However, Borrower received no meaningful response.

29.     Although Borrower made its April 2020 debt service payment, the Governor's Executive Orders had effectively cut off all the Hotel's revenue streams.  Thus, accessing the funds in the Façade Subaccount became critical.

30.     Despite that Borrower communicated the urgency and need for the release of the funds, Keybank continued to delay and had still not released the funds.

31.     For example, on April 6, 2020, Keybank informed Borrower that it could only release the funds if Borrower submitted certain financial reports, even though Borrower had already provided those very reports to Keybank on a rolling basis every month.  Nevertheless, the documents were promptly provided to Keybank by Borrower (for a second time).

32.     Despite Borrower's compliance with Keybank's unnecessary and duplicative requests, the funds were still not disbursed.

33.     Thereafter, on April 20, 2020, Keybank informed Borrower that there would be another delay -- it planned to internally transfer the Loan to a new "Account Manager."  And then, upon transfer, the new manager claimed she could not process the disbursement until she had sufficient time to "get up to speed on the file."

34.     The internal transfer, five months after Borrower's request for the disbursement of funds from the reserve account, occurred despite Keybank's knowledge that Borrower's request was extremely time sensitive due to the pandemic and the Hotel's ongoing government-mandated closure.

35.     On May 3, 2020, Borrower again requested that the funds in the Façade Subaccount be distributed in accordance with the Loan Agreement.  In response, on May 5, 2020, KeyBank informed Borrower that the request was forwarded to the Special Servicer and ultimately on June 18, 2020, the Loan was officially transferred to CWCapital, the Special Servicer.

36.     The funds were never released.

37.     Plaintiff alleges in paragraph 46 of the Complaint that Borrower defaulted on May 5, 2020.

38.     Thereafter, on June 25, 2020, Plaintiff sent Borrower a Notice of Default claiming that an Event of Default had occurred under the Loan Documents "by virtue of Borrower's failure to make the full monthly payments due and owing under the Loan and Loan Documents from and after May 5, 2020."

39.     Had the funds contained in the Façade Subaccount been properly disbursed pursuant to Loan Agreement Section 3.12(b), those funds could have been used to satisfy Borrower's Monthly Debt Service Payment.

40.     Adding insult to injury, three months later by email on September 1, 2020, CWCapital finally responded with respect to the release of the funds, and used the purported "ongoing default" as a justification for the refusal to release the funds to Borrower.  Specifically, the email provided:

- 19 -

> [H]aving seen sufficient evidence that the work was completed, we are *willing to seek approval* to apply funds to the outstanding delinquency.  Releasing the funds to the [B]orrower is not viable *given the ongoing event of default*.  (emphasis supplied)

41.     Thus, the email concedes, that despite prior correspondence and communications to the contrary, neither KeyBank nor CWCapital sought approval for the release of the funds.

42.     Plaintiff's failure to release the funds, and the associated delays without justification, harmed Borrower, is a violation of the Loan Documents, and resulted in unnecessary and improper fees, costs, interest, and penalties being charged to Borrower.

## IV.     Plaintiff Delays the Forbearance Agreement for Months While the Loan Accrues Millions in Interest

43.     Shortly after the pandemic began impacting the Hotel's operations, Borrower began negotiating a potential forbearance agreement with Keybank on April 6, 2020.

44.     Specifically, in April 2020, Borrower first notified Keybank of the issues faced by the Hotel due to the COVID-19 pandemic and requested certain relief pursuant to the terms of the Interagency Statement on Loan Modification and Reporting for Financial Institutions Working with Customers Affected by the Coronavirus.

45.     For example, Borrower requested that Plaintiff engage in discussions, and among other things, forbear with respect to any failure to pay monthly debt service, waive default interest and for the Loan to remain in master servicing.

46.     Indeed, prior to any payments being due in May 2020, Borrower and Keybank participated in a conference call and exchanged emails and Borrower provided certain requested information and documents.  During this time, Borrower was also informed that the Loan was transferred to another representative at KeyBank.

- 20 -

47.     On or around June 18, 2020, Borrower was notified that the Loan was being transferred to CWCapital.

48.     Beginning in July 2020, Borrower continued to negotiate in good faith with CWCapital.  Specifically, CWCaptial's representative informed Borrower on several occasions that its request for forbearance and the modification of the Loan were "reasonable" and "workable" and led Borrower to believe that a forbearance agreement could be reached consistent with then industry standards concerning hotel borrowers during the COVID-19 pandemic

49.     In early July 2020, when Borrower finally had opportunity to discuss its request with CWCapital, it proposed applying its cash reserves held by lender, totaling $2.1 million, including the Façade Subaccount -- which contained nearly $1.1 million -- toward accrued interest and requested a six-month interest deferral.  CWCapital advised that Borrower's proposal seemed reasonable, stating in an email that:

> We are entering into agreements on other loans (subject to credit committee and bondholder approval) to allow for interest forbearance for a period of time provided that the borrower agrees to a repayment schedule, usually with some sort of credit enhancement or new equity contribution.

50.     For the next several months, Borrower continued to receive updates and feedback from CWCapital that led Borrower to believe that an agreement could be reached, which would result in modifying the Loan, and bringing the amounts due current. Specifically, from Borrower's perspective, it expected a comprehensive resolution and/or workout proposal would be reached which would include the application of all cash held in the reserve accounts to be used towards interest payments (approximately 3 months) and 6 months of deferred interest.  Under this expected scenario, Borrower was prepared and expected to resume payments in February 2021, which is consistent with the proposal that was ultimately presented by CWCapital.

- 21 -

51.     However, CWCapital continued to delay any final resolution with the purported justification that it was discussing the Loan with certain bondholders.

52.     Meanwhile, the Loan continued to accrue millions in interest and default interest.

53.     Finally, on February 24, 2021, CWCapital informed Borrower that a term sheet would be provided shortly.

54.     A term sheet was finally provided on or about March 1, 2021 (the "Forbearance Proposal"). The Forbearance Proposal terms included, *inter alia*, waiver of all default interest and late charges, application of various reserve funds held by lender totaling $2.1 million towards accrued interest (covering approximately 3 months of interest), with Borrower resuming interest payment effective February 2021 and any remaining accrued interest totaling $4.3 million deferred to end of 2021. The proposed terms were consistent with similar arrangements of other hotel and commercial properties affected by the pandemic.

55.     Borrower promptly accepted the terms (which were largely identical to its initial request for forbearance made almost a year prior in April 2020) without changes, aside from a request for slight adjustment to the loan modification fee. Borrower was ready and willing to modify the Loan under these terms in February 2021 and make the required payments of approximately $1.9 million in accrued interest payments, expenses and fees, which would have increased by the time the modification was finalized due to the protracted negotiations. In summary, Borrower was prepared for a finalized deal and ready to make payments to bring the Loan current under these accepted terms.

56.     Throughout March and April 2021, Borrower repeatedly requested updates on the status of the Forbearance Proposal. In turn, CWCapital continued to assure Borrower that it was

- 22 -

seeking the required approval of the Forbearance Proposal, first with the committee and then with the bondholders.

57.     In early April 2021, CWCapital advised that the Forbearance Proposal had been provided to the bondholders for approval.  Critically, CWCapital advised that the proposal would not have been submitted for approval if CWCapital did not believe it would be approved.

58.     However, on April 16, 2021, Borrower was notified that the Forbearance Proposal was rejected by certain parties with approval rights.

59.     Although CWCapital informed Borrower that it would seek an alternative proposal to present to Borrower, no further guidance was provided.

60.     In response to CWCapital's stonewalling, in May 2021, Borrower made a new offer:  It would bring current all deferred interest in exchange for a waiver of default interest.

61.     In an email, CWCapital characterized the offer as "good news" and indicated it would present the plan for approval.  In an effort to show that Borrower was committed to bringing the Loan current and reaching new proposed terms, Borrower also resumed making interest payments and made 5 payments totaling approximately $3.4 million, which amounts currently remain in a separate lender-controlled account that could be accessed to pay down some of the accrued interest.

62.     However, Plaintiff promptly rejected Borrower's plan. Although Plaintiff stated that the parties could discuss the following week, no counteroffer was tendered.

63.     Instead, in early June 2021, Borrower learned, for the first time, that new controlling bondholders "had asserted themselves into the deal."  Shortly thereafter, Borrower discovered that Apollo and Triangle had recently obtained a 18% interest in one of the controlling B-B Notes.

- 23 -

64.     On June 11, 2021, mere days before Apollo and Triangle revealed their existence, Borrower received a Demand Notice and Notice of Acceleration from Plaintiff.

**V.      Plaintiff Uses its Ill-Gotten Leverage to
Impose New Predatory Loan Terms**

65.     In early July 2021, Borrower hoped to enter into discussions directly with Apollo and Triangle in a good faith effort to reach a mutually acceptable resolution. Borrower was told to submit a new "creative" proposal.  Since Borrower still did not have a full understanding as to why the initial proposal was rejected, Borrower instead requested that a proposal be provided to it.

66.     Finally, on August 9, 2021, Borrower received a new proposed term sheet from Apollo (the "Note B-B Holder Term Sheet").  Instead of working on a deal that would permit Borrower to pay all past due payments, the Note B-B Holder Term Sheet proposed terms that were shockingly akin to improper and illegal predatory lending practices.

67.     In summary, the proposal to reinstate the Loan to good standing included terms by Apollo and Triangle which would ultimately result in the payment of close to an additional $50 million by the Borrower.  Among other things, Apollo and Triangle demanded a repricing of the loan that bordered on usurious with an increase in the Interest Rate to 8.25%, which was a 75% increase in the Interest Rate and would have resulted in the payment of an additional $6 million in interest per year.  Over the remaining term of the Loan, this increase resulted in a total cost of over $35 million, which would have prevented Borrower from realizing any profits for the remainder of the term of the Loan.

68.     Apollo and Triangle also demanded  full default interest due on the Modification Closing Date totaling approximately $11.4 million, with a potential deferment and forgiveness of 25% of such interest upon certain conditions  Borrower would also be required to pay a  loan

- 24 -

modification fee equal to 1% of the outstanding principal balance of the loan (*i.e.* approximately $1.7 million).

69.     The new proposal also required that the Loan remain in a Cash Sweep Period for the remainder of the term of the Loan, which would have resulted in Borrower not realizing any profits on the Loan until 2027.

70.     Finally, the new proposal required an equity pledge, and an "equity kicker" of 5% of all distributions that would otherwise be payable to Borrower for the remaining term of the Loan.

71.     The outrageous new terms clearly reflected the leverage Apollo and Triangle believed they had due to: (i) the initial and continued improper delay and failure to release the funds in the reserve account, and (ii) the amount of interest and default interest that had accrued due to the improper delay tactics and bad faith conduct during the negotiations.  On September 10, 2021, in an effort to reengage in good faith negotiations, Borrower furnished a counterproposal, as more fully explained above.  However, Apollo and Triangle had no interest in settlement, instead directing the filing of the instant foreclosure action -- without regard to the impact on other bondholders, and which was surely the plan by Apollo and Triangle when it purchased the controlling interest in the B-B Notes.

**VI.   Despite Plaintiff's Bad-Faith, Borrower Made Every Effort to Weather the Unprecedented Challenges Facing the Hotel due to the COVID-19 Pandemic**

72.     In May 2019, the Hotel's occupancy rate was 89.9%.  Exactly one year later, its doors were completely closed.

73.     However, under Borrower's stewardship and despite the catastrophic impact of COVID-19 on the New York hospitality market,  the Hotel has steadfastly increased its occupancy rate to over 79% in October 2021.

RE\31823\0001\4190375v9

74.    Restaurants and bars in the Hotel were permitted to reopen in a limited capacity by July of 2020.  The Hotel itself reopened in September 2020.

75.    Prior to reopening, Borrower developed a comprehensive strategy to ensure that the Hotel's reopening would be safe for both its customers and staff.  Its plan included new hygiene and sanitation measures, new standards throughout the Hotel including the implementation of new technology products to better protect guests and promote the Hotel, and staff training programs.

76.    The Hotel also opened a new outdoor food and beverage service plan to expand offerings outside, new food and beverage menus, new staffing models and a new marketing program.

77.    Borrower also injected more than $15 million into the Hotel to support operations during the COVID-19 pandemic.

78.    Moreover, during this time, Borrower, unlike many similarly situated hotel operators, lowered account payables from $2.7 million to $2.3 million as of October 2021.

79.    Further, Borrower is now current on all real estate taxes that were due in 2020 and 2021.

80.    As a result, the Hotel has fared far better than its competitors, and by October 2021 its occupancy rates increased to a post-pandemic high of 79.2%.  Incredibly, the Hotel has surpassed its peer competitors in terms of occupancy and revenue.

81.    Nevertheless, Plaintiff now seeks to take advantage of the pandemic in order to extract as much as it can from Borrower.

### FIRST COUNTERCLAIM
**(Breach of the Covenant of Good Faith and Fair Dealing)**

82.    Borrower repeats and realleges the allegations set forth in paragraph 1 through 81 of the Counterclaims as if fully set forth herein.

- 26 -

83.     The Loan Agreement is a valid and binding contract between Plaintiff and Borrower.

84.     Implicit in every contract, including the Loan Agreement, is an implied covenant of good faith and fair dealing.

85.     The implied covenant of good faith and fair dealing required Plaintiff to abide by the Loan Agreement in good faith and in such a way as not to frustrate Borrower's contractual rights.

86.     Plaintiff's refusal to disburse the funds contained in the Façade Subaccount was designed to frustrate Borrower's ability to comply with its obligations under the Loan Agreement and ultimately resulted in the inability of Borrower to use those funds to cover interest payments.

87.     By failing to timely release the funds, which resulted in stripping away Borrower's contractual right to use such funds to make debt service payments, Plaintiff caused Borrower to incur unnecessary and improper fees, interest, costs, and penalties.

88.     Had Borrower not been in "default" while negotiating the forbearance agreement, it may have been able to secure more favorable terms.  Specifically, if the funds had been released upon Borrower's urgent follow-up requests, a time where the liquidity was more critically needed by Borrower, the funds could have been applied towards the May interest payment.  Based on subsequent communications with the CWCapital, Borrower believed that the application of remaining reserves could be applicable towards interest and/or accrued interest, which would have covered 3 months of payments then due.  Further, consistent with the Forbearance Proposal, had these funds been released and if Borrower was permitted to defer 6 months of interest, it would have resulted in the Loan being current through February 2021.

- 27 -

89.     Plaintiff's delay while negotiating a forbearance agreement and potential loan modification was also contrary to the spirit and purpose of the Loan Agreement and resulted in the unnecessary accrual of millions of dollars in interest.

90.     The purpose of Plaintiff's imposition of predatory new terms with respect to the proposed forbearance agreement was to make it impossible for the parties to agree on a workout agreement, thereby permitting Plaintiff to attempt to seize the Property for itself.

91.     As a consequence of Plaintiff's breach and Plaintiff's deliberate course of conduct, Borrower has been damaged in an amount yet to be determined, including, but not limited to, additional costs incurred during the protracted negotiation of the forbearance agreements, including, additional fees and interest that have accrued, and other costs and attorneys' fees.

**SECOND COUNTERCLAIM**
**(Declaratory Judgment)**

92.     Borrower repeats and realleges the allegations set forth in paragraph 1 through 91 of the Counterclaims as if fully set forth herein.

93.     CPLR § 3001 authorizes the Supreme Court to render a declaratory judgment "having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed."

94.     An actual, a justiciable controversy now exists between Plaintiff and Borrower regarding their respective rights and duties under the Loan Documents.

95.     A judicial declaration is necessary and appropriate at this time so that Borrower may determine its rights under the Loan Documents.

96.     In an action of an equitable nature, the recovery of interest is within the court's discretion, and the exercise of that discretion will be governed by the particular facts in each case, including wrongful conduct by a lender.

- 28 -

97.     In determining Plaintiff's request for the recovery of default interest here, the Court should consider Plaintiff's (i) violation of the Loan Documents by delaying the release of the funds in the reserve accounts which ultimately resulted in an unnecessary alleged event of default; (ii) unnecessary delay and lack of good faith in settlement negotiations; and (iii) attempts to extort additional interest, penalties and fees by offering proposed terms contrary to prevailing industry standards during the COVID-19 pandemic.

98.     Based upon the foregoing, Borrower is entitled to a declaration that Plaintiff (i) violated the terms of the Loan Agreement in failing to disburse the remaining funds in the Façade Subaccount, resulting in an unnecessary alleged event of default and bringing the instant action; and (ii) is not entitled to the full amount of default interest from May 2020 allegedly due and owing under the Loan Documents.

**WHEREFORE**, Borrower demands judgment as follows:

I.      Dismissing the Complaint with prejudice;

II.     On the first Counterclaim: a money judgment in an amount to be determined by the Court, plus interest;

III.    On the second Counterclaim: declaring that Plaintiff violated the terms of the Loan Agreement when it failed to disburse the remaining funds in the Façade Subaccount and subsequently declared an event of default and foreclosed on the Mortgage;

IV.     Awarding Borrower costs and disbursements incurred in this action, including reasonable attorney fees;

V.      Pursuant to the Court's broad discretionary powers, declaring that Plaintiff, due to its delay, and bad faith conduct during the course of negotiations, should be barred, or equitably tolled from recovering the full amount of default interest allegedly due under the Loan Documents; and

- 29 -

VI.     For such other and further relief as this Court may deem just and proper.

Dated:  New York, New York                    **ROSENBERG & ESTIS, P.C.**
        December 16, 2021                     *Attorneys for Defendant*
                                              *GC SHL, LLC*


                                              By: <u>*/s/ Stacey A. Lara*</u>
                                              Stacey A. Lara
                                              733 Third Avenue
                                              New York, New York 10017
                                              (212) 867-6000
                                              slara@rosenbergestis.com

- 30 -