UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

                          Plaintiff,

              -v-

GC SHL, LLC, *et al.*,

                         Defendants.

21-CV-8940 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

    Defendant GC SHL, LLC ("GC SHL") brings two counterclaims against Plaintiff Wells Fargo Bank ("Wells Fargo") for breach of the implied covenant of good faith and fair dealing and for a declaratory judgment that Wells Fargo violated the terms of the parties' loan agreement.  (Dkt. No. 21 ("Answer").)  Wells Fargo moves to dismiss GC SHL's two counterclaims for failure to state a claim. (*See* Dkt. No. 30.)  For the reasons that follow, Wells Fargo's motion is granted as to both counterclaims.

**I.    Background**

    The following facts, presumed true for the purposes of this opinion, are taken from the operative answer and "any statements or documents incorporated in it by reference." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 174 (2d Cir. 2021).  Some undisputed facts not addressed in the Answer are taken from the Complaint.  *See Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075, 2020 WL 3472597, at *1 n.1 (S.D.N.Y. June 25, 2020).

    In October 2017, Natixis Real Estate Capital LLC ("Natixis") made a $170,000,000 loan to GC SHL.  (Docket No. 1 ("Compl.").)  The original loan is governed by a Loan Agreement, a note splitter agreement, and a loan modification agreement.  (Compl. ¶¶ 23–24.)  Natixis transferred all right, title, and interest in and to the original loan, as well as various

accompanying loan documents, to Wells Fargo in Wells Fargo's capacity as trustee of a commercial mortgage trust. (Compl. ¶ 29.) CWCapital Asset Management LLC ("CWCapital") is the special servicer of the original loan and the attorney-in-fact on behalf of Plaintiff. (Compl. ¶ 44.) According to § 2.5.1 of the Loan Agreement, GC SHL is required to make payments "irrespective of, and without any deduction, set-off or counterclaim whatsoever." (Docket No. 31-3.) Per § 10.15 of the Loan Agreement, GC SHL waives any "right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by [Wells Fargo] or its agents." (*Id.*) Per § 10.13 of the Loan Agreement, Wells Fargo and its agents are not liable for "any monetary damages," and GC SHL's sole remedies "shall be to commence an action seeking injunctive relief or declaratory judgment." (*Id.*)

GC SHL purchased the Standard High Line Hotel (the "Hotel") in 2017 for $340,000,000, and this purchase was financed in part by the original loan. (Answer ¶ 13.) In March 2020, the Hotel closed due to lockdowns imposed by city and state officials in response to the COVID-19 pandemic. (Answer ¶¶ 16–20.) Deprived of its source of income, GC SHL sought to rely on sections 3.1, 3.10(a)(iii), and 3.12 of the Loan Agreement, according to which money in a subaccount for façade work could be disbursed in order to satisfy GC SHL's debt service payments. (Answer ¶¶ 21–23.) In August 2019, GC SHL informed KeyBank Real Estate Capital ("KeyBank"), the loan servicer, that the façade subaccount contained funds in excess of those required to complete the façade work. (Answer ¶ 25.) In October 2019, GC SHL provided to KeyBank a façade report pursuant to the Loan Agreement and requested that the remaining funds be released. (Answer ¶ 26.)

In March 2020, GC SHL again contacted KeyBank to release the funds in the façade subaccount. (Answer ¶ 28.) In April 2020, KeyBank informed GC SHL that it would have to

submit financial reports before KeyBank could disburse the façade funds, even though GC SHL had submitted these reports on a monthly basis. (Answer ¶ 31.) Later that month, KeyBank informed GC SHL that any disbursement of the façade funds would be delayed due to KeyBank's internal transfer of the loan to a new account manager, and the new account manager informed GC SHL that the disbursement could not be processed until "she had sufficient time to 'get up to speed on the file.'" (Answer ¶ 33.) In May 2020, GC SHL submitted a new request for disbursement, and KeyBank responded that the request had been forwarded to CWCapital, the special servicer. (Answer ¶ 35.) The funds were never released, and in June 2020, Wells Fargo sent GC SHL a notice of default. (Answer ¶ 38.)

In July 2020, GC SHL signed a pre-negotiation agreement disclaiming all potential claims against Wells Fargo and related parties "in connection with the Loan Documents." (Docket No. 31-4 ("First PNA").) In June 2021, GC SHL signed a second such agreement. (Docket No. 31-5 ("Second PNA").) The First PNA contains language providing that Wells Fargo and GC SHL are to commence negotiations relating to GC SHL's obligations under the Loan Agreement. (First PNA at 2.) Moreover, the First PNA contains a "No Claims" provision, which states that GC SHL "acknowledges and agrees that to its knowledge it currently holds no claim against" Wells Fargo. (First PNA at 5.) The First PNA also contains a provision explaining that a default occurred due to GC SHL's failure to make its regular monthly payments under the Loan Agreement. (First PNA at 3.) The Second PNA outlines that GC SHL "intends to engage in direct discussions with" Wells Fargo in connection with the Loan Agreement. (Second PNA at 2.) The Second PNA also contains several release provisions, which state that GC SHL "hereby fully, forever and irrevocably releases, discharges, and acquits each of the Note B-B [h]older, the [s]pecial [s]ervicer, the [h]olders and each and all of their [r]elated [p]arties."

3

(Second PNA at 3.) The Second PNA incorporates the First PNA by reference. (*See* Second PNA at 2.)

## II.      Legal Standard

In evaluating a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6), courts apply "the same standard as a motion to dismiss a complaint." *Phoenix Cos., Inc. v. Concentrix Ins. Admin. Solutions Corp.*, 554 F. Supp. 3d 568, 585 (S.D.N.Y. 2021). Thus, this Court "must accept all well-pleaded facts as true and construe the answer and counterclaims in the light most favorable to the nonmoving party." *Id.*

## III.     Discussion

GC SHL asserts two counterclaims: for breach of the implied covenant of good faith and fair dealing and for a declaratory judgment that Wells Fargo violated the terms of the Loan Agreement. GC SHL premises its counterclaims on two theories. The first theory posits that GC SHL was unable to make its loan payments because Wells Fargo delayed disbursing funds from the façade subaccount, thus manufacturing a default. The second theory posits that GC SHL suffered further injury due to Wells Fargo's delays during the course of the parties' post-default negotiations.

Wells Fargo contends that both counterclaims are barred as a matter of law by the parties' pre-negotiation agreements and that the first counterclaim for breach of the implied covenant of good faith and fair dealing is independently barred as a matter of law under the Loan Agreement's prohibition on counterclaims for money damages. GC SHL counters that a claim for good faith and fair dealing cannot be waived as a matter of public policy.

###     A.      The Pre-Negotiation Agreements

Courts applying New York law have "consistently" upheld pre-negotiation agreements "on the basis of New York's policy favoring the enforcement of unambiguous contracts." *In re*

4

*Vargas Realty Enters., Inc.*, 440 B.R. 224, 243 (S.D.N.Y. 2010).  New York courts have upheld pre-negotiation agreements by which debtors waived defenses, claims, counterclaims, or any cause of action whatsoever.  *Id.*  Courts in this district have pointed to the "clear language" of pre-negotiation agreements in determining that a plaintiff's rights have been waived.  *See, e.g.*, *Fed. Home Loan Mortg. Corp. v. Drofan Realty Corp.*, No. 95 Civ. 5858, 1996 WL 15680, at *3 (S.D.N.Y. 1996).  The waiver in the Second PNA is both comprehensive in the scope of its limitation on liability and unambiguous in its terms.  (*See* Second PNA at 3.)

Courts applying New York law have not hesitated to enforce a "written . . . bargain between sophisticated parties" when a contractual party that "explicitly disclaimed counterclaims and defenses at a time when it was aware of the facts it now alleges in support of its current claim" seeks to bring a claim in contravention of a waiver.  *Inter-Am. Dev. Bank v. IIG Trade Opportunities Fund*, No. 16 Civ. 9782, 2017 WL 6025350, at *7 (S.D.N.Y. 2017).  This is particularly so when the waiver at issue is both unequivocal as to its terms and broad as to its scope.  *Id.* at *7 (noting that the waiver at issue "explicitly waived all defenses and stated that all payments must be made 'without any set-off, counterclaim, withholding, or condition'").  GC SHL signed the Second PNA with full awareness of that agreement's release provisions, according to which GC SHL is to "hereby fully, forever and irrevocably release[ ], discharge[ ], and acquit[ ]" Wells Fargo.  (Second PNA at 3.)  GC SHL also signed the First PNA, according to which it "acknowledge[d] and agree[d] that . . . it currently [held] no claim against" Wells Fargo.  (First PNA at 5.)  Yet GC SHL bases its counterclaims at least in part on events that had occurred prior to its signing of the First PNA  (*See generally* Answer.)  Therefore, at the time that GC SHL signed the First PNA, it was aware of at least some of the conduct that would later serve as the basis for its counterclaims, namely Wells Fargo's alleged delay in disbursing the

façade funds.  (*See generally* Answer.)  This timeline, and GC SHL's concomitant awareness of certain facts that serve as the basis for its counterclaims *prior* to its signing of the First PNA, militate "particularly strong[ly]" in favor of enforcing the unambiguous waivers of the Second PNA.  *Inter-Am. Dev.t Bank*, 2017 WL 6025350, at *7.

To be sure, the preclusive scope of liability-limitation provisions is not unlimited.  Liability-limitation provisions "will not exonerate a party from liability under all circumstances" and do "not apply to an exemption of willful or grossly negligent acts," acts evincing "intentional wrongdoing," or a high level of recklessness.  *Net2Globe Intern., Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450–51 (S.D.N.Y. 2003).

However, GC SHL has not alleged conduct that would rise to the level of malicious interference with its contractual obligations and that could therefore overcome the liability-limitation provisions of the pre-negotiation agreements.  While § 3.12(b) of the Loan Agreement requires Wells Fargo to disburse façade subaccount funds at GC SHL's request, such disbursements are contingent on GC SHL using the money for façade remediation and on there being no ongoing event of default.  (Docket No. 31-3.)  Thus, the Loan Agreement does not require Wells Fargo to disburse façade funds solely to allow GC SHL to make its monthly payments, a conclusion that is doubly true in the event of a default.  In the event of a default, Wells Fargo is free to rely on § 3.10(c) of the Loan Agreement, which makes clear that Wells Fargo "may apply . . . proceeds of repayment in such order and in such manner" as Wells Fargo "shall elect."  (*Id.*)  Moreover, § 2.5.1 of the Loan Agreement also makes clear that GC SHL is to make all payments "irrespective of, and without any deduction [or] set-off."  (*Id.*)  Wells Fargo may rely on the express provisions of the Loan Agreement, under which it is free not to disburse the façade funds in the event of a default.  Mere reliance on Loan Agreement provisions does not

rise to the level of malice or recklessness contemplated by the case law on liability-limitation provisions because simply following the express contractual terms of the Loan Agreement does not suggest *intentional* wrongdoing or a purpose to injure GC SHL, as Wells Fargo cannot maliciously delay that which it had no contractual obligation to undertake.  *See Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667, 2007 WL 403301, at *4 (S.D.N.Y. Feb. 2, 2007).

Independent of whether Wells Fargo's *conduct* provides a basis for ignoring the liability-limitation provisions, GC SHL has not adequately pleaded its theory that Wells Fargo has engaged in the kind of wrongdoing that could warrant ignoring the express terms of the pre-negotiation agreements.  Its Answer refers circuitously to an "illicit scheme to improperly usurp monies" through "deliberate bad faith."  (Answer at 13.)  GC SHL also alleges, albeit indirectly, that Wells Fargo manufactured the default and that Wells Fargo "conveniently cited the alleged default as a purported justification for its refusal to release" the façade funds.  (Answer at 14.)  Thus, even if GC SHL had alleged the type of malicious conduct that could overcome a liability-limitation provision, which it has not, GC SHL's allegations are conclusory.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B.  The Loan Agreement

Though the Court agrees with Wells Fargo that both claims are barred as a matter of law under the pre-negotiation agreements, the Court also addresses Wells Fargo's argument that GC SHL's first counterclaim for monetary damages is independently barred under the Loan Agreement.

Per the Loan Agreement, GC SHL waives any "right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding" brought by Wells Fargo and that Wells Fargo is not liable for "any monetary damages."  (Dkt. No. 31-3.)  GC SHL's sole remedy "shall be to commence an action seeking injunctive relief or declaratory judgment."  (Docket No. 31-

3.) Importantly, Wells Fargo does *not* argue that under the Loan Agreement, GC SHL cannot bring a counterclaim for breach of the implied covenant of good faith and fair dealing, but only that GC SHL cannot assert a claim for *monetary damages*.

The term of the Loan Agreement waiving GC SHL's right to pursue any claim involving monetary damages is a "routinely enforced liability-limitation provision[s] . . . contracted by sophisticated parties," *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016), and the terms represent the parties' agreement on the "allocation of risk of economic loss." *Net2Globe*, 273 F. Supp. 2d at 450.  Thus, irrespective of the pre-negotiation agreements, which are a comprehensive bar to GC SHL's recovery, the terms of the Loan Agreement independently provide a basis for dismissing GC SHL's first counterclaim.[1]

## IV. Conclusion

For the foregoing reasons, Wells Fargo's motion to dismiss is GRANTED as to both counterclaims.

The Clerk of Court is directed to close the motion at Docket Number 30.

SO ORDERED.

Dated: August 23, 2022
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[1] Because the Court agrees with Wells Fargo that the pre-negotiation agreement and Loan Agreement bar GC SHL's counterclaims as a matter of law, the Court does not address Wells Fargo's other bases for dismissing the counterclaims.